**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY**

| | | |
|---|---|---|
| David Elliot on behalf of himself and all others similarly situated, | : | |
| | : | |
| Plaintiff, | : | Case No. 3:22-CV-329-RGJ |
| | : | |
| v. | : | |
| | : | |
| | : | |
| Humana, Inc., | : | |
| | : | |
| Defendant. | : | |
| | : | |

**EXPERT REPORT OF ANYA VERKHOVSKAYA**

**September 13, 2024**

# TABLE OF CONTENTS

I.     INTRODUCTION ............................................................................................... 3

II.    SUMMARY OF OPINIONS ............................................................................... 3

III.    EXPERIENCE AND QUALIFICATIONS ........................................................ 4

IV.    DATA AND DOCUMENTS RELIED ON ...................................................... 12

V.    OPINION 1: Using the Source Data provided by Defendant, there is a reliable and efficient method by which the subscribers and/or users of telephone numbers which received telephone calls made by Defendant, and meeting certain criteria set forth in the Peters Declaration, can be identified and located. .................................................... 13

    A.    Historical Reverse Append of Names and Addresses Overview.................... 13

    B.    Historical Carrier Reverse Append via Tel-Lingua........................................ 19

    C.    Carrier Subpoena Process............................................................................... 19

    D.    Email Reverse Append .................................................................................... 21

    E.    Removing Purported Customer Telephone Numbers, if any........................... 21

    F.    Methodology for Creating a List of Potential Class Members ....................... 21

VI.    OPINION 2: Using the Source Data provided by Defendant, there is a reliable and efficient method of efficiently and effectively notifying the proposed Class that comports with the requirement of Federal Rule of Civil Procedures 23 and due process. ................................. 22

VII.    CONCLUSION ................................................................................................. 25

I, Anya Verkhovskaya, hereby state as follows:

1.      The facts set forth in this report (the "Expert Report") are based upon my personal knowledge, and I could competently testify to them if called upon to do so.

## I.      INTRODUCTION

2.      Plaintiff's counsel asked me to apply my decades of experience in the fields of data analysis, class member identification and location in class action litigations and to provide my opinions concerning issuance of the notice of class certification, pursuant to the requirements of Due Process, to potential class members in this action (the "Action").

3.      Plaintiff retained me at an hourly rate of $525 for the data analysis and my time preparing this Expert Report, and $675 for testimony in deposition, at a hearing, or in trial. My staff performs work at rates ranging between $90 and $275 per hour. My compensation does not depend upon the opinions that I offer or on the outcome of this matter.

4.      In the past ten years, I have authored no publications.

5.      I am over the age of 21 and I am not a party to this action.

6.      I am not a member of any of the Class(es) proposed for certification by Plaintiff.

7.      I have testified as an expert witness at deposition or trial in the last four years in the cases listed on Exhibit 1.

## II.     SUMMARY OF OPINIONS

8.      OPINION 1: Using the data provided by Defendant, there is a reliable and efficient method by which the subscribers and/or users of telephone numbers which received telephone calls made by Defendant, and meeting certain criteria set forth in the Declaration of Christina Peters-Stasiewicz (the "Peters Declaration"), can be identified and located.

9.      OPINION 2: Using the data provided by Defendant, there is a reliable and efficient method of efficiently and effectively notifying the proposed Class that comports with the requirements of Federal Rule of Civil Procedure 23 and due process.

10.      These opinions are offered to a reasonable degree of certainty within the fields of data management, data analysis, class member identification and location, notice, and claims administration.

## III.      EXPERIENCE AND QUALIFICATIONS

11.      I am the President and Chief Executive Officer of Class Experts Group, LLC (CEG), a firm that offers litigation support services, including as consulting or testifying experts, with a focus on data management and data analysis, particularly in the area of TCPA, consumer protection, human and civil rights class actions. CEG also provides class notification, claims administration, and consumer protection class action litigation support services.

12.      I have more than two decades of experience serving as an expert witness or court-approved administrator in various class action matters, including hundreds of TCPA cases and consumer protection, employment, antitrust, securities fraud, ERISA, human and civil rights, and other class action claims. My resumé describes my experience and qualifications in more detail and is attached as Exhibit 2.

13.      In my professional experience, I have analyzed, overseen, and directed data analysis, and made determinations regarding sets of data containing billions of records, including but not limited to the analysis of telephone call records; credit card company records; governmental agency data files; life, automobile, medical, and title insurance records; medical billing records; mortgage, securities, and other banking records; and other large-volume data sets from dozens of industries.

14.      As a result of this experience, I am familiar with numerous and diverse methods and systems that are commonly used to perform reliable record analysis on voluminous sets of data, including, but not limited to loading, standardizing, transformation, querying, and cross-referencing.

15.      I have extensive experience in identifying and locating class members in order to administer class actions and related programs, involving all aspects of direct, media, digital, email,

and third-party notice programs, data management, claims administration, and settlement fund distribution, both domestically and internationally.

16.    I have overseen the administration, processing, and adjudication of millions of class action claims, including analysis, classification, processing of documentation (paper and digital) and related correspondence; issuance of payment; and assuring legal and tax settlement fund compliance.

17.    I regularly serve as an expert witness, providing opinions and testimony in state and federal court cases related to class member identification and location, class certification, notice adequacy, claims administration, and settlement disbursal.

18.    I also serve as an expert witness, providing opinions and testimony in TCPA cases concerning identification of wireless telephone numbers; telephone numbers registered on the NDNCR, tallying of telephone call dispositions; internal do-not-call list violations; reverse-append of names, mailing, and email addresses; historical and current telephone carrier identification; address updating; historical identification of telephone numbers as business or residential; and cross-referencing data points between two or more data sets in order to aggregate or compare information. For example, my team and I provided expert reports employing or describing many of these or similar methods, and offered either deposition and/or trial testimony, including but not limited to the following TCPA cases:

> *Abante Rooter & Plumbing, Inc. v. Alarm.com, Inc.*, No. 15-cv-06314 (N.D. Cal.)
>
> *Bakov v. Consolidated World Travel*, No. 15-cv-02980 (N.D. Ill.)
>
> *Baldwin v. Miracle-Ear, Inc.*, No. 20-01502 (D. Minn.)
>
> *Benzion v. Vivint, Inc.*, No. 12-cv-61826 (S.D. Fla.)
>
> *Berman v. Freedom Fin. Network, LLC*, No. 18-cv-01060 (N.D. Cal.)
>
> *Biringer v. First Fam. Ins., Inc.*, No. 14-cv-00566 (N.D. Fla.)
>
> *Brown v. DirecTV, LLC*, No. 13-cv-01170 (C.D. Cal.)
>
> *Buchanan v. Sirius XM Radio, Inc.*, No. 17-cv-00728 (N. D. Tex.)
>
> *Chinitz v. Intero Real Estate Services*, No. 18-cv-05623 (N.D. Cal.)
>
> *Chinitz v. NRT West, Inc.*, No. 18-cv-06100 (N.D. Cal.)

*Cordoba v. DIRECTV, LLC*, No. 15-cv-03755 (N.D. Ga.)

*CS Wang & Assoc. v. Wells Fargo Bank, N.A.*, No. 16-11223 (N.D. Ill.)

*Drayton v. Toyota Motor Credit Corp.*, No. 16-cv-00046 (M.D. Fla.)

*Duchene v. Westlake Services, LLC*, No. 13-cv-01577 (W.D. Pa.)

*Fabricant v. AmeriSave Mortgage*, No. 19-04659 (C.D. Cal.)

*Fitzgerald v. Universal Pictures*, No. 16-cv-01193 (M.D. Fla.)

*Garcia v. Target Corp.*, No. 16-cv-20727 (S.D. Fla.)

*Gilmore v. USCB Corp.*, No. 17-cv-00119 (M.D. Ga.)

*Goins v. Palmer Recovery Attys., PLLC*, No. 17-cv-00654 (M.D. Fla.)

*Heidarpour v. Cent. Payment Co. LLC*, No. 15-cv-00139 (M.D. Ga.)

*Hennie v. ICOT Hearing Systems, LLC d/b/a ListenClear*, No. 18-02045 (N.D. Ga.)

*Hopkins v. Modernize, Inc.*, No. 17-cv-40087 (D. Mass.)

*Hossfeld v. Compass Bank*, No. 16-cv-02017 (N.D. Ala.)

*Jenkins v. National Grid USA*, No. 15-cv-01219 (E.D.N.Y.)

*Johansen v. One Planet Ops, Inc.*, No. 16-cv-00121 (S.D. Ohio)

*Johnson v. Comodo Group, Inc.*, No. 16-cv-04469 (D.N.J.)

*Johnson v. Navient Solutions, Inc.*, No. 15-cv-00716 (S.D. Ind.)

*Krakauer v. DISH Network, LLC*, No. 14-cv-00333 (M.D.N.C.)

*Manopla v. Home Depot USA, Inc.*, No. 15-cv-01120 (D.N.J.)

*McMillion v. Rash Curtis & Assoc.*, No. 16-cv-03396 (N.D. Cal.)

*McCurley v. Royal Seas Cruises, Inc.*, No. 17-0986 (S.D. Cal.)

*Mey v. Frontier Commc'n Corp.*, No. 13-cv-01191 (D. Conn.)

*Mey v. Honeywell Int'l, Inc.*, No. 12-cv-01721 (S.D.W. Va.)

*In re Monitronics Int'l., Inc. TCPA Litig.*, No. 13-md-02493 (N.D. W. Va.)

*Morris v. SolarCity Corp.*, No. 15-cv-05107 (N.D. Cal.)

*Lennartson v. Papa Murphy's Int'l. LLC*, 15-cv-05307 (W.D. Wash.)

*Pieterson v. Wells Fargo Bank, N.A.*, No. 17-cv-02306 (N.D. Cal.)

*Reyes v. BCA Fin. Services, Inc.*, No. 16-cv-24077 (S.D. Fla.)

*Roberts v. Wyndham Int'l, Inc.*, No. 12-cv-05083 (N.D. Cal.)

*Samson v. United Health Care Services*, No. 19-cv-00175 (W.D. Wash.)

*Slovin v. Sunrun, Inc.*, No. 15-cv-05340 (N.D. Cal.)

*Trenz v. Volkswagen Grp of Am.*, No. 15-cv-08356 (C.D. Cal.)

*Youngman v. A&B Ins. & Fin.*, No. 16-cv-01478 (M.D. Fla.)

*West v. Cal. Service Bureau, Inc.*, No. 16-cv-0324 (N.D. Cal.)

*Williams v. PillPack, LLC*, No. 19-cv-05282 (W.D. Wash.)

*Winters v. Capital One Bank (USA) N.A.*, No. 17-cv-01178 (C.D. Cal.)

*Wright v. eXp Realty, LLC*, No. 18-cv-01851 (M.D. Fla.)

19.     I served as an expert retained by the defendant to assist with claims review and audit in the claims administration process for *Birchmeier v. Caribbean Cruise Line, Inc.*, Case No. 12-04069 (N.D. Ill.). I was retained by the defendant to provide my expertise concerning claims administration, which included review of telephone carrier subpoena response data.

20.     I was the court-appointed settlement administrator and managed claims processing and the fund distribution and/or was a notice expert, including but not limited to the following TCPA cases:

*Benzion v. Vivint, Inc.*, No. 12-cv-61826 (S.D. Fla.)

*Brey Corp v. Life Time Improv., Inc.*, No. 11-cv-00948 (D. Md.)

*Brieger v. Tellabs, Inc.*, No. 06-cv-1882 (N.D. Ill.)

*Brown v. Rita's Water Ice Franchise Co., LLC*, No. 15-cv-3509 (E.D. Pa.)

*Buchanan v. Sirius XM Radio, Inc.*, No. 17-cv-00728 (N.D. Tex.)

*Collins v. Am. Consumer Shows, Inc.*, No. 10-cv-11912 (D. Mass.)

*Desai v. ADT Security Services, Inc.*, No. 11-cv-1925 (N.D. Ill.)

*Duchene v. Westlake Services, LLC*, No. 13-cv-01577 (W.D. Pa.)

*Fray-Witzer v. Metropolitan Antiques, LLC*, No. 02-5827 (Mass. Super. Ct.)

*Fray-Witzer v. Olde Stone Land Survey Co., Inc.*, No. 08-cv-04175 (Mass. Super. Ct.)

*Heidarpour v. Cent. Payment Co., LLC*, No. 15-cv-00139 (M.D. Ga.)

*Horton v. Cavalry Portfolio Services*, *LLC*, No. 13-cv-00307 (S.D. Cal.)

*Ikuseghan v. MultiCare Health Sys.*, No. 14-cv-05539 (W.D. Wash.)

*Krakauer v. DISH Network, LLC*, No. 14-cv-00333 (M.D.N.C.)

*LaVigne v. First Cmty. Bancshares, Inc.*, No. 15-cv-00934 (D.N.M.)

*Luster v. Green Tree Servicing, LLC*, No. 14-cv-01763 (N.D. Ga.)

*Mann & Co., PC v. C-Tech Ind., Inc.*, No. 08-cv-11312 (D. Mass.)

*Martin v. Dun & Bradstreet, Inc.*, No. 12-cv-00215 (N.D. Ill.)

*Mey v. Herbalife Int'l, Inc.*, No. 01-C-263 (W.Va. Cir. Ct.)

*Mey v. Interstate Nat'l Dealer Services, Inc.*, No. 14-cv-01846 (N.D. Ga.)

*Mey v. Venture Data, LLC*, No. 14-cv-00123 (N.D.W. Va.)

*Milford & Ford Assoc., Inc. v. Am. Consumer Shows, LLC,* No. 10-cv-11912 (D. Mass.)

*Milford & Ford Assoc., Inc. v. Cell-Tek, LLC*, No. 09-cv-11261 (D. Mass.)

*Mohamed v. Am. Motor Co., LLC,* No. 15-cv-23352 (S.D. Fla.)

*Munday v. Navy Fed. Credit Union,* No. 15-cv-01629 (C.D. Cal.)

*Nguyen v. Vantiv LLC,* No. 15-cv-02436 (N.D. Cal.)

*O'Neill v. Carrington Mortgage Serv.'s*, No. 19-cv-10643 (Mass. Super. Ct.)

*Peltier, et al., v. Bernhardt, et al.*, No. 1:20-cv-03775 (D. D.C.)

*Ward v. Flagship Credit Acceptance LLC,* No. 17-cv-02069 (E.D. Pa.)

21.    In each case, I employed a reliable method using industry-standard best practices to identify and locate persons who met the class definition. If asked to do so here, I could likewise employ a reliable method to identify and locate Class members.

22.    These cases collectively identified, notified, and/or issued payment to millions of persons who met the respective class definitions in each case. Identifying, locating, notifying class members, processing claims, and issuing payment are routine processes that claims administration firms have been completing under court supervision for decades.

23.    Many of the cases listed above involved classes comprised of persons for whom the defendants did not have name/address/email information. In each case, I used industry-standard best practices to identify class members' missing contact information and ultimately to ensure payment to settlement class members who submitted valid claim forms.

24.    Courts have admitted my expert opinions and testimony about my data analysis methods, notice programs' effectiveness and efficiency, and the reliability of claims administration determinations made under my direction, in dozens of cases.

25.    In *Krakauer v. DISH Network, LLC*, No. 14-cv-00333 (M.D.N.C.), when defendants sought to exclude my report, the court noted that it had "reviewed a number of

Ms. Verkhovskaya's reports and declarations during the course of these proceedings and heard her testify at trial… Based on its familiarity with her work over time and on its personal, in-court observations of her testimony, the Court finds her to be a credible witness and has no concerns about her honesty or integrity." The jury then weighed my testimony about initial data processing (call dispositions and durations), identification of telephone numbers on the NDNCR at a given point in time, and identification of residential and business telephone numbers. The jury entered a verdict in favor of the plaintiff and the class (with treble damages). In denying a later motion to set aside the verdict, the court stated that "Ms. Verkhovskaya provided clear, cogent testimony explaining her methodology and the bases for her opinions. To the extent there was conflicting evidence that questioned the validity, credibility, and weight of Ms. Verkhovskaya's opinions, the jury weighed that evidence and rejected Dish's evidence."

26.     Also, in the *Krakauer* matter, Defendant's expert opined that my method was unreliable. The court dismissed this testimony, stating that Defendant's expert "testified at some length that Ms. Verkhovskaya 'failed to apply the proper standards, the accepted standards of data analysis'" but that even "if the Court agreed that Ms. Verkhovskaya's evidence was shaky, ***which it does not***, Dish had a full opportunity to contest it and took advantage of that opportunity… The plaintiffs offered credible evidence that [the vendor] made thousands of telemarketing phone calls on Dish's behalf and as Dish's agent to residential numbers…in violation of federal law… [T]here was no miscarriage of justice." (emphasis added, citations omitted).

27.     In *McMillion v. Rash Curtis & Associates*, No. 16-cv-03396 (N.D. Cal.), a jury weighed my testimony about historical wireless identification of telephone numbers and historical reverse-append of users and/or subscribers names and addresses. The jury entered a verdict in favor of Plaintiff McMillion and the classes at $500 per each call I identified, resulting in a common fund award of $267,349,000.

28.     Several other courts have commented favorably on the record regarding my TCPA-related experience and expertise.

29.     In *Shamblin v. Obama for America*, No. 13-cv-2428 (S.D. Fla.), the court called me "amply qualified," saying that my "relevant experience, education, and training render [me] competent to offer expert testimony in TCPA cases." The court also noted that I "employ generally reliable methodologies … and utilization of LexisNexis data …"

30.     In *Reyes v. BCA Financial Services, Inc.*, No. 16-cv-24077 (S.D. Fla.), the court noted that "[s]everal other district courts have also relied on Verkhovskaya's expertise when deciding whether to certify TCPA and other classes," including *Shamblin* and *Krakauer*, before denying a *Daubert* motion to strike my expert report in that matter.

31.     In *Abante Rooter & Plumbing, Inc. v. Alarm.com*, No. 15-cv-06314 (N.D. Cal.), the court denied a motion to strike my expert report under *Daubert*, where defendant had argued that the data I relied on to identify business telephone numbers was not reliable. The court noted that the same argument had been made in Krakauer, and the court there had "rejected a similar challenge to her methodology … finding that Ms. Verkhovskaya properly used Lexis Nexis data to remove business numbers from her output list because it was the type of data reasonably relied upon by experts in the field" and the error rate in the data was normal for the field. Concurring, the court denied the *Daubert* motion and admitted my opinion into evidence.

32.     In *Chinitz v. Intero*, No. 18-cv-05623 (N.D. Cal.), the court denied a motion to strike my expert report under *Daubert*, because the defendant argued that the data I relied on to identify business telephone numbers is not reliable. The court stated, "… Indeed, several courts have approved of Ms. Verkhovskaya's use of LexisNexis to remove business numbers from her output list as this is the type of data reasonably relied upon by experts in the field."

33.     In addition to the cases referenced above and, in my resumé, I have also overseen a number of complex, large-scale domestic and international administration programs.

34.     As the court-appointed notice administrator in the *In re Holocaust Victim Assets Litig.*, 105 F. Supp. 2d 139 (E.D.N.Y. 2000), I played a key role in a worldwide Phase I notice program that resulted in the processing of more than 500,000 initial questionnaires relating to a

$1.25 billion settlement. In Phase III of that matter, I coordinated delivering notice to more than 10,000 Jewish communities in 109 countries. In both Phases I and III of that matter, I administered international help and call centers that directly assisted more than 100,000 potential claimants, created a class-appropriate notice targeting members of the Romani community in 48 countries, directed hundreds of staff in communicating with Romani communities and individuals, and notified more than two million people of the settlement.

35.    I was appointed by the government of Germany to lead notice and claims collection efforts in the German Forced Labour Compensation Programme (GFLCP). Under my direction, the program located more than 43,000 Romani survivors in 17 countries in central and eastern Europe who were potentially eligible for humanitarian aid. I oversaw creation of a comprehensive database for the GFLCP and the Holocaust Victim Assets Programme and coordinated direct assistance with claim completion for more than 11,000 Romanies in eight central and eastern European countries.

36.    I was appointed by Chairman Lawrence Eagleburger, former U.S. Secretary of State, to serve as consultant to the International Commission on Holocaust Era Insurance Claims (ICHEIC) on notice and outreach strategies and supervised the notification of claimants and face-to-face assistance programs in eastern Europe and the former Soviet Union.

37.    I was appointed by the Israeli government as the administrative director of Project HEART (Holocaust Era Asset Restitution Taskforce) to provide essential tools, strategy, and information to enable Israel and its partners to secure restitution for eligible Jewish Holocaust victims and their heirs. Project HEART was one of the most comprehensive multilingual notice campaigns ever undertaken, covering 137 countries. I assisted in launching a multilingual, interactive website, establishing a 24-hour call center in 13 languages, distributing more than 500,000 documents to potentially eligible families of Holocaust victims, handling more than 80,000 telephone calls, conducting archival research, and creating the most comprehensive online database of nearly two million records looted Jewish property. In addition, under my supervision, Project HEART reached out to 15,000 non-governmental organizations (NGOs) to engage them

in the project to provide personal assistance to thousands of Holocaust victims and their heirs in making their claims.

38.    I was appointed as the Settlement Administrator in the matter of *Leslie Ann Wilkie Peltier, et al. v. Deb Haaland, et al.*, No. 20-cv-03775 (D. D.C.), a class action lawsuit to redress alleged breaches of trust by the United States Department of the Interior, the United States Department of the Treasury, and the United States of America with respect to the accounting and management of two Judgment Awards of the Indian Claims Commission (ICC). The $59 million settlement provides relief to several generations of tribal families. As part of this litigation, I worked over the course of several years to develop a novel class notification and claims adjudication process that would quickly and efficiently distribute settlement funds to surviving tribal members and their heirs, many of whom are ageing. At the preliminary approval hearing, the federal judge overseeing the settlement noted that CEG was "instrumental in helping to shape the deal…"

39.    At the final settlement approval fairness hearing, class counsel noted that CEG "made extensive efforts to identify and reach" the class and that CEG's class notification efforts "have met or gone beyond the Rule 23 and due process…requirements…The notice program here has been thorough…" In his order granting final class action settlement agreement approval, the court noted that CEG's class notification process provided "the best notice practicable under the circumstances…and it was reasonably calculated to reach the class members."

40.    As an indication of the notice adequacy and its expansive reach, claimants were reached beyond the USA and claims were filed by class members from six additional countries: Australia, Austria, Canada, Germany, The Netherlands, Norway, and South Korea.

## IV.    DATA AND DOCUMENTS RELIED ON

41.    My opinions are based on the information available to me as of today. I reserve the right to supplement or amend this Expert Report should new data or information be provided by the Defendant.

42.     I received and/or relied on the following files and documents in forming my opinions outlined in this Expert Report:

    a.  the Peters Declaration, including exhibits;

    b.  HUM_000422.xlsx; HUM_000417.xlsx; HUM_000294.csv; HUM_000295.csv; HUM415.xlsx; HUM_000171.xlsx through and including HUM_000288.xlsx; HUM_000297.csv; and HUM_000297_R.xlsx through and including HUM_000414_R.xlsx (the "Source Data"); and

    c.  Defendant Humana Inc.'s Responses and Objections to Plaintiff's Second Set of Interrogatories and Requests for Production Documents;

    d.  Humana's Responses to Plaintiff's First Set of Interrogatories and Request for Admissions;

    e.  Transcript of Amber Williams, March 25, 2024 (the "Williams Transcript);

    f.  Transcript of Melinda D'Ippolito, May 15, 2024 (the "D'Ippolito Transcript");

    g.  Transcript of Angelle Guarisco, August 28, 2024 (the "Guarisco Transcript").

    h.  the Class Action Complaint and Request for Jury Trial.[1]

**V.     OPINION 1: Using the Source Data provided by Defendant, there is a reliable and efficient method by which the subscribers and/or users of telephone numbers which received telephone calls made by Defendant, and meeting certain criteria set forth in the Peters Declaration, can be identified and located.**

A.     Historical Reverse Append of Names and Addresses Overview

43.     To identify potential class members, and to effectuate issuance of direct mail notice of class certification, I would perform additional data enhancement to locate potential class members' names and addresses, including, but not limited to, performing a standard historical reverse append process.[2]

---

[1] Prior to reviewing these materials I reviewed the Protective Order in this Action.

[2] Prior to completing the process described in this Opinion 1, I could undertake a wireless identification process to determine which telephone numbers were wireless at the time of the calls. This is a standard process that is completed regularly by notice and claims administrators. I would identify calls made to wireless numbers using data from Interactive Marketing Solutions (IMS), the largest provider of wireless identification services and obtains ported number data from the U.S. Number Portability Administration Center (NPAC). This allows IMS to offer comprehensive historical data on telephone line statuses. The FCC has relied on IMS data for enforcement actions and penalties, recognizing it as an industry-standard tool for determining if calls were made to wireless numbers. Courts also frequently accept IMS data as a reliable method for identifying wireless phone calls.

44.     During my more than 20 years of experience conducting data analysis and serving as an expert and testifying witness, as well as notice and claims administrator in TCPA and other class action cases, I routinely analyze telephone call records to identify names, mailing addresses, and/or email addresses associated with the telephone numbers within a specific timeframe, using a historical reverse append methodology. Reverse append refers to the process of using one field of data to retrieve other related and relevant data fields.

45.     Over my decades of experience in the field of class action litigation support services, I have overseen and, myself, performed historical reverse append in the context of ongoing litigation and also, even more frequently, in the context of notice and settlement administration. In fact, I have been involved in the historical reverse append process in more than one hundred cases, including but not limited to those listed in my resume. Because of this experience, I have extensive knowledge and familiarity with the appropriate processes and procedures required for the historical reverse append.

46.     I have worked with various data processors to establish protocol that can be used for identification of potential class members. Data processors provide data enrichment and data verification, data validation, data customization, fraud prevention, identity verification, telemarketing and other industry compliance solutions. They provide data services to corporate, government, ecommerce, financial services, healthcare, benefits administration, utility service, telecom, etc. In my experience I have found the data processors' information to be accurate and reliable, and I have not found any reason to consider it unreliable.

47.     Various courts have reviewed my utilization of data processors and found it acceptable. *See Abante Rooter & Plumbing, Inc. v. Alarm.com*, No. 15-CV-6314-YGR, 2017 WL 1806583, at *4 (N.D. Cal. May 5, 2017) (finding I had properly used  data processor information "because it was the type of data reasonably relied upon by experts in the field and the 14% error rate was not unreasonably high for these particular circumstances") (citing *Krakauer v. Dish Network, L.L.C*, 2015 WL 5227693, at *8-9 (M.D.N.C. Sept. 8, 2015)).

48.     Under the jurisdiction of various courts, I have successfully used and/or proposed to use information from data processors in numerous TCPA and related cases for the historical reverse append process to identify names and mailing addresses based on telephone numbers and dates of the telephone calls to those telephone numbers in cases that include, but are not limited to:

*Bakov v. Consolidated World Travel*, Case No. 15-cv-02980 (N.D. Ill.)

*Brown v. DirecTV, LLC*, Case No. 13-1170 (C.D. Cal.)

*Buchanan v. Sirius XM Radio*, 17-00728 (N.D. Tex.)

*Cortes v. National Credit Adjuster*, 17-02152 (S.D. Cal.)

*Diaz-Lebel v. TD Bank USA, N.A.*, 17-01611 (D. N.J.)

*Fitzgerald v. Universal Pictures*, 16-01193 (M.D. Fla.)

*Flowers v. Twilio, Inc.*, No. RG16804363 (Cal. Sup. Ct., Alameda Cnty.)

*In Re: Collecto, Inc., TCPA Litigation*, 14-02513 (D. Mass.)

*Krakauer v. DISH Network, LLC*, 14-00333 (M.D. N.C.)

*Kubacki v. Peapod, LLC*, No. 13-00729 (N.D. Ill.)

*Lofton v. Verizon Wireless (VAW) LLC*, 13-05665 (N.D. Cal.)

*McMillion v. Rash Curtis & Associates*, 16-03396 (N.D. Cal.)

*Vance v. DirecTV, LLC*, Case No. 17-cv-00179 (N.D. W.Va.)

*Ward v. Flagship Credit Acceptance LLC,* No. 17-cv-02069 (E.D. Pa.)

*West v. California Service Bureau, Inc.*, 16-03124 (N.D. Cal.)

49.     In *Krakauer v. DISH Network, LLC*, No. 14-cv-00333 (M.D.N.C.), when defendants sought to exclude my report, the court noted that it had "reviewed a number of Ms. Verkhovskaya's reports and declarations during the course of these proceedings and heard her testify at trial… Based on its familiarity with her work over time and on its personal, in-court observations of her testimony, the Court finds her to be a credible witness and has no concerns about her honesty or integrity." The jury then weighed my testimony and entered a verdict in favor of the plaintiff and the class (with treble damages). In denying a later motion to set aside the

verdict, the court stated that "Ms. Verkhovskaya provided clear, cogent testimony explaining her methodology and the bases for her opinions. To the extent there was conflicting evidence that questioned the validity, credibility, and weight of Ms. Verkhovskaya's opinions, the jury weighed that evidence and rejected Dish's evidence."

50.    Also, in the *Krakauer* matter, Defendant's expert opined that my method was unreliable. The court dismissed this testimony, stating that Defendant's expert "testified at some length that Ms. Verkhovskaya 'failed to apply the proper standards, the accepted standards of data analysis'" but that even "if the Court agreed that Ms. Verkhovskaya's evidence was shaky, **which it does not**, Dish had a full opportunity to contest it and took advantage of that opportunity… The plaintiffs offered credible evidence that [the vendor] made thousands of telemarketing phone calls on Dish's behalf and as Dish's agent to residential numbers…in violation of federal law… [T]here was no miscarriage of justice." (emphasis added, citations omitted).

51.    Furthermore, upon an appeal to the United States Court of Appeals for the Fourth Circuit, the court concluded:

> … Class adjudication is complicated, and getting it right requires a careful parsing of the claims and the evidence from the start. It also requires striking a balance between efficient administration and fairness to all those affected, whether they be the class members, the defendants, or absent parties who are nonetheless bound by the judgment. The proceedings below reflected just the measured and thorough approach that we might hope for in such demanding situations. For the foregoing reasons, the judgment is *AFFIRMED*.

52.    Courts have generally accepted standard historical reverse append processes, including recently in the matter of *Brown v. DirecTV, LLC*, Case No. 13-1170 (C.D. Cal.):

> … Plaintiffs will rely on the post-judgment claims process to definitively identify Class Members. This multi-step process would first use a "reverse look-up" procedure to identify the person … using phone carrier records and third-party consumer databases… Plaintiffs would then provide traditional notice to that person (*i.e.*, via phone call, text message, mail, and/or e-mail), and finally, require them to submit a claim form with an affidavit attesting to their information. A special master could oversee any disputes between the parties along the way.[3]

---

[3] December 1, 2021, Order re Cross-Motions for Summary Judgment; Defendant's Motion for Decertification of the Class.

53.     In *Vance v. DirecTV, LLC*, Case No. 17-cv-00179 (N.D. W.Va.), I had proposed to use the historical reverse append methodology, and the Court granted class certification stating:

> …DirecTV claims the "total inadequacy" of the reverse lookup methodology is revealed by its own comparison of the AC1 source data to a Lexis database. [Doc. 325 at 12-13]. This Court's review of defendant DirecTV's research in this regard appears to indicate the exact opposite.

54.     The data processors access their respective databases of public and proprietary information to produce an output including the names, mailing addresses, and email addresses of the subscribers and/or users of those telephone numbers within the relevant timeframe.

55.     The data processors track information over a historical period. In this way, a historical snapshot is captured and can be analyzed based upon timeframe and dates going back for years.

56.     My methodology relies on the data processors to gather data from sources including, but not limited to: the utility companies; credit bureaus; consumer data compilers; banking and loan applications; colleges; voter registration; tax rolls; voting and census data, etc. If the person uses a telephone on a regular basis, my methodology will capture it.

CHURN OF TELEPHONE CARRIERS AND TELEPHONE NUMBERS

57.     The term "churn" is applicable in the context of TCPA litigation and in this case specifically in two different ways:

      a.     Telephone carrier churn is when consumers keep their telephone numbers but change one telephone carrier to another; and

      b.     Telephone number churn, also referred as telephone number reassignment, is when consumers change their telephone numbers, hence those telephone numbers get reassigned to other consumers.

58.     Telephone carrier and telephone number churn does not prevent me from being able to effectuate a reliable historical reverse append process.

59.     My methodology also identifies names and mailing addresses associated with various types of telephone service plans, including but not limited to group/family plans and/or prepaid plans.

GROUP AND/OR FAMILY PLANS

60.    My method is also able to identify and locate, to a reasonable degree of certainty within the field of class action administration, the subscribers and/or users of telephone numbers during a proposed Class Period, including in instances where those telephone numbers are part of group and/or family plans.

61.    The method I utilize captures consumers' use of telephone numbers on, for example, utility bills, credit cards accounts, legal documents, and alike. Consumers are incentivized to accurately report their telephone numbers in these settings and not to use telephone numbers of other persons even if they are on the same group and/or family telephone plans.

62.    Regardless of whether those consumers use group and/or family plans, the usage patterns of their telephone numbers would be the relevant data I utilize in my process. That data will more likely than not associate consumers with their telephone numbers.

PREPAID TELEPHONE PLANS

63.    My historical reverse append method of identifying and locating subscribers and/or users of the telephone numbers is inclusive of identifying consumers who utilize prepaid telephone plans. In effect, most prepaid telephone plans are no longer any different from postpaid telephone plans except that on the front end they proactively limit services, such as data usage and monthly telephone services.

64.    Similarly, to the group and/or family plans, the prepaid telephone plan owners' consumer behavior falls within the same pattern. It is also common sense that the quantity of consumers who do not fall within the typical consumer behavior pattern and who do not want anyone to know their telephone numbers is not in any way significant.

65.    Telephone companies permit and, indeed, commonly ask that subscribers and/or users of prepaid telephone plans register their names and/or contact information, inclusive of mailing addresses.

66.    To perform the historical reverse append process, I first prepare a file of the relevant telephone numbers, and I submit the relevant data file to the data processor from which a historical reverse data append process is performed.

67.    If several individuals were the users of a telephone number in question due to telephone number porting from one individual to another, or any other reason, those two individuals would be listed as the users of those telephone numbers within the same and/or overlapping timeframe, as applicable.

B.    Historical Carrier Reverse Append via Tel-Lingua

68.    I would add another layer of name and mailing address identification, where possible by coordinating the carrier subpoena process to obtain additional name and mailing address information.

69.    To be able to issue carrier subpoenas to correct telephone carriers, I would first identify which telephone carrier was responsible for maintaining which telephone numbers during the relevant timeframe using Tel-Lingua.

70.    After the Tel-Lingua Output is received, the historical carrier information is researched by CEG to identify the current carrier who should receive the subpoena. Due to mergers and acquisitions, there are instances where a subpoena related to a historical carrier should be issued to the current carrier.

71.    The results of the historical carrier reverse append is then utilized for the purposes of the subpoena process effectuation as described further below.

C.    Carrier Subpoena Process

72.    The subpoenas would be served on the current carriers identified in the historical carrier reverse append process and could, for example, include the following:

    a.    Request to provide the names, mailing addresses, and email addresses of the subscribers;

    b.    The timeframe of relevant proposed period;

    c.    Request to provide the names, mailing addresses, and email addresses of the users where that information is in existence; and

     d.  Request to provide information on whether the telephone number is part of the group and/or family plan where that information is in existence.

73.    When the telephone call data is produced by telephone carriers, in addition to the subscriber names, mailing addresses, email addresses and other plan-related information, telephone carriers often provide names, mailing addresses, and email addresses of the users. Although it is not required by telephone companies, many users and/or subscribers that are on family or group plans "assign" the telephone numbers to particular users of that plan. It makes it easier to manage, to allocate different add-on features, upgrade telephones, review telephone bills, tracking data and minute usage for budgeting purposes, monitoring telephone usage of employees, associates and/or minor children, etc. Whether family or group plans, or prepaid telephone plan, it is often the case that telephone companies have names, mailing addresses, and email addresses of the actual users in addition to names, mailing addresses, and email addresses of the subscribers.

74.    Similar subpoena processes were completed in a number of TCPA cases, including but not limited to *Birchmeier et al. v Caribbean Cruise Line, Inc., et al*, Case No. 12-cv-04069 (N.D. Ill.); *Griffith v. ContextMedia, Inc.*, No. 16-cv-02900 (N.D. Ill.); and *C.S. Wang & Assoc., et al. v. Wells Fargo Bank, N.A., et al.*, Case No. 16-cv-11223 (N.D. Ill.).

75.    As I described earlier, I have experience working with telephone carrier subpoena data as I served as an expert retained by Defendant for, in part, that purpose in the *Birchmeier* case.

76.    In *Brown, et al. v. DIRECTV, LLC*, Case No. 13-cv-01170-DMG (C.D. Cal.); *Hoagland v. Axos Bank*, Case No. 20-cv-00807-LL-DEB (S.D. Cal.); I reviewed carrier subpoena response data at the request of counsel.

77.    I am familiar with the type of data telephone carriers are able to produce and I find this data reliable for the purposes of class action notice and claims administration.

78.    The process to identify potential class members in methods similar to the subpoena process, such as via requests to third parties, is commonly used in hundreds of class actions, especially in the securities fraud and the antitrust cases, where the names and addresses of potential class members are mostly in possession of third parties.

D.     Email Reverse Append

79.     Email is a reliable and effective way to reach consumers in a timely and cost-efficient way; email is a communication tool that consumers use regularly. According to a November 30, 2022, article[4] by Katrina Kirsch, 99% of email users check their inbox every day, with some checking 20 times a day. The percentage of internet users in the United States who use email averages more than 90% per age group (with 85.53% of users age 65+ using email and 95.19% of users age 25-44 using email), according to a November 2021 Statista survey.[5]

80.     The email reverse append process utilizes name and contact information available to identify up to five email addresses per potential class member.

E.     Removing Purported Customer Telephone Numbers, if any

81.     Once the subpoena process is effectuated and the data received based on that process is analyzed, the names and telephone numbers from the customer list could then be compared programmatically, as an additional measure to remove potential customers.

82.     These combined criteria are intended to apply the aforementioned conservative methodology to remove instances where Defendant reached a customer whose name was associated with the telephone number at issue or any other telephone number in the call records, or who was a spouse of the customer, or a customer who changed her name due to marriage and/or divorce or other reasons, regardless of the timeframe.

F.     Methodology for Creating a List of Potential Class Members

83.     Once the telephone carriers provide the information that was requested in the subpoenas, I would implement the following steps to finalize the list of potential Class members to notice, applying the following method:

    a. If there is a discrepancy between data processor-identified name and subpoena-identified name, utilize both names;

    b. If there is no data processor-identified name, utilize the subpoena-identified name;

---

[4] https://blog.hubspot.com/marketing/email-marketing-stats
[5] https://www.statista.com/statistics/271501/us-email-usage-reach-by-age/

    c.  If there is no subpoena-identified user name and just the subpoena-identified subscriber name, utilize the subpoena-identified subscriber name; and

    d.  To the extent there are multiple names in the historical reverse append and in the subpoena-identified data, utilize those multiple names per telephone numbers for the purposes on the notice effectuation as described below.

## VI.   <u>OPINION 2</u>: Using the Source Data provided by Defendant, there is a reliable and efficient method of efficiently and effectively notifying the proposed Class that comports with the requirement of Federal Rule of Civil Procedures 23 and due process.

84.    Providing notice of class certification or of class settlement is a standard process that class action administrators have been performing for decades. I have overseen notice of class certification and notice of class action settlement in more than 1,700 class action cases in my professional experience.

85.    It is a straightforward and administratively feasible process to provide notice of class certification to class members in TCPA cases. Once names, mailing and/or email addresses of class members associated with the telephone numbers in the file are identified, the notice can be easily provided.

86.    The most efficient and cost-effective way to do so is to email a notice and/or mail via the United States Postal Service (USPS) a postcard short-form notice to class members and make a long-form notice available via website. I have coordinated notice of Class Certification under court supervision in many TCPA cases.

87.    I would also coordinate to update any addresses through the USPS's National Change of Address ("NCOA") database, which contains approximately 160 million records or 48 months of permanent address changes. NCOA is updated daily and USPS regularly provides change-of-address information to NCOA licensees. NCOA helps reduce undeliverable-as-addressed ("UAA") mail by correcting input addresses prior to mailing. Additional address updating via Experian service would be coordinated for any addresses determined to be undeliverable. Further, I could coordinate with additional data vendors, such as Experian, to

identify addresses based upon name and telephone number information for further supplementation of addresses or other information that has not yet been identified.

88.    I regularly use these processes to identify potential class members in class actions, as do other administration firms. In my experience, these processes are reliable, are reasonably relied upon by experts in the field, and are approved by courts charged with oversight of class actions, class notice, and settlement administration. Based on my review of and analysis of the information provided to me, the process detailed above could be applied here.

89.    In similar prior cases, CEG has utilized telephone numbers of those persons who should receive notice to match to digital social media users for targeting across social media platforms in such a manner that the publication notice, in the form of digital banners, will be seen by individuals believed to be potential class members. The paid social media program served digital banners across different platforms, such as mobile and desktop web, Facebook, and Instagram.

90.    It is also possible to issue notice via a direct manual calling or text messaging process. Following the call or text message campaign, the class action notice administrator could subsequently forward direct mail notice to the name and address the call/text message recipient provides.

91.    Utilizing two call center agents, it would be possible to have those two individuals text numerous telephone numbers within a standard work week. In fact peer-to-peer (non-automated) texting is now a commonly used method of reaching targeted populations. The below information is from CallHub, a text message services provider:

> The campaign manager uploads the contact list and assigns a batch of contacts to each agent, who then reach out and engage people in one-to-one conversations. Each agent can send out around 3,500 texts in the span of an hour…Since agents are manually hitting the send button for every text, with texts going out from a ten digit number, p2p texting stays compliant of texting regulations. https://callhub.io/peer-to-peer-texting-campaign/

92.    The notice and/or settlement administration, though standard, is an involved process which allows for verification of recipient, and or claimant, name, address, and telephone

number as of a given point in time utilizing an affidavit and/or a claim form. Such affidavit and/or claim form is mailed to the potential class members and is made available on the case-related website for self-identification and self-attestation as to the facts of each class member and is completed under the penalty of perjury.

93.    I have overseen notice of class certification, notice of class settlement claims adjudication, and fund distribution in more than 1,700 class action cases in my professional experience.

94.    In a rare instance, even if a notice and a claim form were mailed to someone who was, perhaps, the subscriber but not the customary user, it is common sense and reasonable to expect that the subscriber would forward the notice and the claim form to the customary user.

95.    Further, in addition to sending out direct mail notice, to meet due process requirements of Rule 23(c), of the Federal Rules of Civil Procedures, it is the standard practice of notice administrators to issue a press release or some form of targeted publication notice and to establish a notice website and a call center.

96.    Likewise, it is common to require that any judgment award be withheld until a claimant's information is validated via claim form or by submitting some other form of proof from the claimant's telephone records, bills, attestations, etc.

97.    Very often, and especially in instances of securities fraud-based class actions, the class action notices are sent to more individuals than those who are deemed ultimately qualified to participate in any judgment or settlement award. The notices include verbiage that makes it clear to the recipients that they may be eligible to be a class member only if they meet certain criteria.

98.    In this matter it would be possible, for example, to ask that potential class members provide documentation and/or sworn affidavits/attestations asking for the following information:

> If they received a wrong number call from Defendant;
> What was their telephone number at that time;
> How long they have had the telephone number;
> Whether they share the telephone number with anyone;

> Whether they are or were a customer of Defendant; and
>
> Whether they share the account with anyone else.

99.     Claim forms that are submitted during the claim administration process can then be verified against information from Defendant as well as against the information from the historical reverse append process, and the subpoena process in order to verify the validity of a claim.

100.    In a notice and claims administration process described above, it is also possible to have a list of preliminary-validated claims reviewed by the parties in order to remove, through a meet-and-confer process, any possible customers of Defendant as based upon the available information (name, address, telephone number). Further, a Special Master could be utilized to adjudicate disputes, if any, between the parties.

101.    I am familiar with several administrative processes very similar to the one described herein, which were overseen and approved by various courts.

## VII.    CONCLUSION

102.    Considering the foregoing, I offer the following opinions in this Experts Report:

103.    OPINION 1: Using the Source Data provided by Defendant, there is a reliable and efficient method by which the subscribers and/or users of telephone numbers which received telephone calls made by Defendant, and meeting certain criteria set forth in the Peters Declaration, can be identified and located.

104.    OPINION 2: Using the Source Data provided by Defendant, there is a reliable and efficient method of efficiently and effectively notifying the proposed Class that comports with the requirements of Federal Rule of Civil Procedure 23 and due process.

105.    I have reached the opinions expressed herein based on the data available to me currently. I reserve the right to amend these opinions when and if additional data become available to me.

Executed at Milwaukee, Wisconsin, this September 13, 2024.

Anya Verkhovskaya