**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY**

DAVID ELLIOT

       Plaintiff,

v.

HUMANA INC.,

       Defendant.

Case No. 3:22-CV-329-RGJ

**HUMANA'S BRIEF IN OPPOSITION TO PLAINTIFF'S
<u>MOTION FOR CLASS CERTIFICATION</u>**

**HEARING REQUESTED PER L.R. 7.1(F)**

## TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................ 1

II.    BACKGROUND ................................................................................................ 5

III.    LEGAL STANDARD: RULE 23'S STRICT REQUIREMENTS ................................... 15

IV.    ARGUMENT: THE CLASS CANNOT BE CERTIFIED FOR MANY REASONS ...... 16

     A.    Plaintiff Doesn't Offer Evidence to Support Class Certification.......................... 16

     B.    Plaintiff Cannot Show that Common Questions Predominate............................. 17

     C.    The Plaintiff Cannot Establish Ascertainability. .................................................. 29

     D.    Plaintiff Cannot Prove Any of the Other Five Prerequisites to Certification. ...... 31

          1.    Plaintiff Cannot Establish Commonality. .................................................. 31

          2.    Plaintiff Cannot Establish Adequacy. ........................................................ 32

          3.    Plaintiff Cannot Establish Typicality.......................................................... 34

          4.    Plaintiff Cannot Establish Numerosity. ..................................................... 34

          5.    Plaintiff Cannot Establish Superiority. ...................................................... 35

V.    CONCLUSION.................................................................................................. 35

## I.    INTRODUCTION

This TCPA class action arises from federally required calls Humana makes to Special Needs Plan (SNP) members with chronic conditions. The calls provide this vulnerable population a free service called a Health Risk Assessment (HRA). HRAs ensure these members' basic needs are met, including access to food, housing, and transportation to medical appointments.

These calls don't trigger TCPA liability because the emergency purposes exception applies, per Humana's summary judgment motion. Setting that aside, consent is a complete defense to TCPA liability. And Humana only places HRA calls to SNP members who consent to receive those calls. It also calls non-members who consent to receive communications on a (often elderly or disabled) member's behalf, such as family, guardians, friends, or nursing homes. This pervasive fact alone disproves Plaintiff's assumption that a call to a non-member's number is a "wrong number" that Humana doesn't have consent to call.

Humana made one of these HRA calls to an SNP member named Debra L. But, unbeknownst to Humana, Debra L.'s phone number was no longer hers. It was reassigned to Plaintiff, who received the HRA calls instead. When that happened, Plaintiff didn't ask for the calls to stop. He instead hired an attorney and downloaded an app from his attorney's firm that purportedly tracked the calls he received. Plaintiff then filed a TCPA class action lawsuit, seeking millions of dollars from Humana to try to profit from the important calls Humana makes to provide federally required healthcare services to its special needs members.

Now, Plaintiff asks the Court to certify a class of non-members who received similar "wrong number" calls that allegedly violated the TCPA, claiming he has a class-wide way to show that Humana *lost* the consent it had to call a number (because, *e.g.*, the number was reassigned). Notwithstanding that Humana often has consent to call numbers that don't belong to a member, the core of his theory is that he can identify non-"account holders" who received prerecorded calls, and that Humana "necessarily did <u>not</u>" have "consent" to make those calls (at 16). He also claims that Humana's records show when it continued to send prerecorded HRA calls after a number became a "wrong number."

Humana's records and interviews with "class members" show the opposite. The first step in Plaintiff's method to identify calls to non-consenting numbers is to use hand-typed, freestyle notes from a system called Clinical Guidance eXchange (CGX), which Humana uses to record interactions with SNP members (among other purposes). Hundreds of Humana employees input freestyle notes in CGX, using their discretion to describe what happens on any given call. Plaintiff nonetheless claims that CGX notes containing "wrong number"—which is an inadmissible double hearsay statement—means Humana made a call without consent.

Overwhelming evidence shows that's false. Initially, Humana employees making HRAs use "wrong number" in a variety of ways. Many use it to mean simply that the SNP member (or their caretaker) was busy when Humana called. Others have totally different intentions. A note from March 2019, for example, says that an employee reached an "unknown party" who said the member "was not available" and "then fell asleep while on the call." *Id.* No one knows who that individual was. The care manager typed "wrong number" in the CGX note anyway.

Call recordings also show that CGX notes with the term "wrong number" may not actually mean Humana reached a number Humana didn't have consent to call. One freestyle CGX note from May 2022 says that Humana reached a "wrong number" when it called a phone number associated with SNP member Derrick M. But when Humana called the same phone number again a few months later, someone named "Derrick" said he was busy but confirmed it was "okay" for Humana to call back later, suggesting it was *right* party contact all along. Humana found many similar examples after reviewing a tiny fraction, *less than 1%*, of the relevant call recordings.

On top of all that, more than a dozen sworn declarations, including from individuals Plaintiff claims are class members, show that individual testimony is always required to determine whether Humana reached a number that Humana was provided consent to call. One such declaration from a nursing home administrator said that the home cared for a Humana special needs member, consented to receive calls for her, and added that "[m]ultiple . . . employees . . . might answer []his number at any given time." Traxler Decl. ¶ 4. The number has a freestyle CGX note with the term "wrong number" anyway, and the number appears on Plaintiff's list of 23,000

numbers at which the wrong people supposedly received wrong number calls.

The upshot of all this is simple: The first step in Plaintiff's process is totally unreliable because a freestyle "wrong number" CGX note doesn't mean Humana didn't have consent to call that number to speak with or about a member. The only way to determine that is by an individual analysis that would involve thousands of depositions of call recipients and members, on top of still more depositions, written discovery, and subpoenas to test their veracity. This alone shows that his putative class could never be certified.

Plaintiff's errors don't stop there. Plaintiff relies on Humana's records of calls that attempted to send prerecorded calls after the date of the CGX freestyle note with the term "wrong number." But he does nothing to verify whether a prerecorded message Humana *attempted* to send to a number was delivered, a prerequisite to TCPA liability. This too requires a careful analysis of the individual circumstances surrounding a phone call. Plaintiff's own case confirms as much. He testified he received prerecorded calls Humana's records show it attempted. But his own cell phone records show he perjured himself because he never actually received those calls.

As still another example, Plaintiff then proposes using a "reverse append" (or look-up) process to identify who owns the alleged wrong numbers. That process involves Plaintiff's expert (Ms. Verkhovskaya) obtaining information from data providers, then using that information to send subpoenas to cell carriers for contact information to email class notice. Plaintiff doesn't apply that process here—not even to his own individual case. He just asks the Court to take his word for it, ignoring all the times other courts found the reverse append process unreliable or irrelevant. *See, e.g.*, *Carroll v. SGS Auto.*, 2020 WL 7024477, at *5 (M.D. La. Nov. 30, 2020) ("Verkhovskaya's methodology is insufficiently reliable"). But that's no surprise: Humana tried to apply Plaintiff's process and found that it ***excluded Plaintiff***.

This is why Plaintiff (and his expert) lastly propose inviting putative class members to submit a "self-attestation" form, one that literally determines Humana's liability by asking if "they received a wrong number call." That would violate due process because Humana has a right to examine *everyone* who submitted those forms at trial. *See City Select Auto Sales Inc. v. BMW Bank*

3

*of N. Am. Inc.*, 867 F.3d 434, 442 (3d Cir. 2017) (forms would "violate Defendants' due process rights") (cit. omitted).

Plaintiff's own shifting methodologies show that there is no reliable way to identify calls that Humana lost consent to make. Plaintiff's motion completely abandons the method his expert disclosed in discovery, which did not use CGX records. He now pivots to a new methodology using CGX records. Both methods, in theory, should identify roughly the same putative class members, if they were at all reliable, but they don't come close. ***Only 255 numbers out of thousands overlap***. Plaintiff, in other words, has twice tried to answer the same question: How to identify numbers Humana called after "losing" consent? And he came up with two completely methods that lead to different answers, showing that his methods are nothing but guesswork.

This overwhelming evidence, among more discussed below, confirms that Plaintiff cannot meet his burden to satisfy any of the elements of certification many times over. Most importantly, predominance requires him to prove that his case can be tried without devolving into a series of individual mini-trials about the circumstances of each putative class member's claim, like whether Humana had consent to call the number, when Humana allegedly lost consent, and whether the number received a prerecorded message after Humana lost consent. Such mini-trials are *certain*, and would require individual review of tens of thousands of CGX notes and call recordings and testimony from (and written discovery to) even more people.

Plaintiff likewise cannot satisfy ascertainability, commonality, or superiority for similar reasons. As to ascertainability, Plaintiff imposes several vague prerequisites to class membership without a non-individualized way of identifying people who meet them. That includes failing to identify whether class members must be subscribers or mere users of the numbers called, and failing to identify a non-individualized way to identify "non-account holders" Humana called. Next, Plaintiff's common questions either don't resolve Humana's liability or cannot be answered with common proof, confirming there is no commonality or superiority. And Plaintiff cannot show numerosity because his "process" fails to identify a single class member—himself included.

On top of that, neither Plaintiff nor his counsel are adequate. Plaintiff perjured himself at

about the number of calls he received to inflate his damages. And his counsel abetted their client's perjury to ensure they keep their share of the millions they expect from Humana. They also failed to communicate individual settlement offers to their client for the same purpose: Elevating their own financial interests above Plaintiff and the putative class they purport to represent.

Plaintiff's certification motion should be denied.

## II.    <u>BACKGROUND</u>

### A.    Humana Obtains Consent Before Calling SNP Members, Who Often Use Other People's Numbers (with Permission) as a Point of Contact.

Humana is a health insurance company. Some of its members have special healthcare needs, including because they suffer from chronic healthcare conditions. Guarisco Decl. ¶ 5. These members may qualify for certain plans that provide them with extra services as part of their health insurance plans to make sure their special needs are met. Guarisco Decl. ¶ 5. For example, a Special Needs Plan is an insurance plan that provides extra resources and guidance for members with chronic (and often severe) health conditions, like late-stage dementia or Alzheimer's. Guarisco Decl. ¶ 5. Humana members are eligible for SNPs given entitlement to Medicare Part A or B or chronic medical conditions, which are regulated by federal law. *Id.* ¶¶ 6-7.

Federal law requires Humana to contact its SNP members to provide a healthcare service called a Health Risk Assessment to assess health status and determine medical, functional, mental, and financial health risks, among others. *Id.* ¶¶ 8-9. HRAs don't cost any money for SNP members—they are a healthcare service that their plan covers. *Id.* HRAs help, for instance, to ensure that members receive necessary healthcare and have their basic needs met, like access to food and housing. *Id.*

To contact SNP members, Humana acquires phone numbers at different times and in different ways. *See* Guarisco Decl.; Benson ¶¶ 9-10; Decl. T. Daugherty ¶¶ 8-9. Humana members provide contact phone numbers to the company, including on their health insurance enrollment forms, so Humana obtains their numbers directly. *Id.*; Guarisco Decl. ¶¶ 14-15.

But SNP members are often elderly people suffering from severe, disabling health conditions. So this group frequently gives Humana phone numbers that don't belong to them as a point of contact. They may give Humana a daughter's, son's, spouse's, friend's, or roommate's number. *Id.* "That is especially true for members whose health conditions make it difficult for them to manage their own affairs." Daugherty Decl. ¶ 8. Humana has reached many special needs members' family members when calling to perform HRAs. Daugherty Decl. ¶¶ 8-9. In many instances, "[t]hese family members have agreed that the member can use their phone number as a point of contact for Humana, and they often help [Humana] reach the member[.]". *Id.*

SNP members sometimes give Humana the phone numbers of nursing homes, other care facilities, or homeless shelters as points of contact for Humana. Guarisco Decl. ¶ 15; Daugherty Decl. ¶ 9; Gregoire Decl. ¶¶ 9-10. Humana has reached many employees of these facilities who have *agreed* to allow Humana to contact a member staying with them (even though someone who doesn't know that might pick up and say "wrong number"). *Id.* That said, there's no non-individualized way to determine where any given number originated.  Guarisco Decl. ¶ 13.

To place these HRA calls, Humana sometimes uses prerecorded messages to make sure SNP members receive good information and avoid human error on calls. *Id.* ¶¶ 12-13. Humana only sends prerecorded HRA calls for SNP members after receiving consent to call a number, like by obtaining the number from the member. *Id.* That's true even when Humana obtains a number from someone other than SNP members. A *live* representative calls that number first to confirm consent and ensure it's a good contact number for the member before Humana places any prerecorded calls. *Id.*

Simply put, Humana sends prerecorded calls about HRAs only to numbers it has consent to call, whether that's the special needs member's number or the number of one of their caretakers, a fact that cannot be ascertained from Humana's (or any) records.

**B.    Humana Care Managers that Contact SNP Members and Their Caregivers Hand-Type Freestyle Notes About Those Calls into a Database Called CGX.**

To complete HRAs, hundreds of Humana employees called Care Managers call SNP members (or their caregivers) and then record the results of those calls (in Humana's Clinical Guidance eXchange ("CGX") system. Guarisco Decl. ¶¶ 16-20; Benson Decl. ¶ 15; Daugherty Decl. ¶ 14. The records of calls in CGX include fields for the members' names, their subscriber IDs, phone numbers, and the date the system created an entry for the member. *Id.* It also contains a field called "CommRecNote," a field for hand-typed, freestyle call notes that the Care Manager placing or receiving a call can use to write whatever they want, typically a brief description of the call. *Id.*

CGX, in other words, doesn't contain a limited universe of disposition "codes" selected to accurately document what the outcome of any given inbound or outbound call was—unlike many other "wrong number" TCPA class actions. *See e.g.*, *Wesley v. Snap Fin.*, 339 F.R.D. 277, 298 (D. Utah 2021); *see also Sliwa v. Bright House Networks*, 333 F.R.D. 255, 271 (M.D. Fla. 2019) (denying certification in wrong-number TCPA class action because not even call dispositions *codes* could reliably identify wrong number calls). CGX freestyle notes instead allow Care Managers to type whatever they see fit, leaving Humana's hundreds of Care Managers to use their discretion and judgment to describe the calls they're handling. Guarisco Decl. ¶ 22.

**C.    Determining What the Phrase "Wrong Number" Means in a Hand-Typed Note Requires Individually Reviewing Those Notes.**

Humana does not necessarily train Care Managers on how to use the term "wrong number" or any similar terms like "wrong #" in their hand-typed CGX freestyle notes.  Guarisco Decl. ¶ 22 Benson Decl. ¶ 15; Daugherty Decl. ¶ 15; Gregoire Decl. ¶ 16. The reason is that Humana has a process to mark numbers "invalid" in a drop-down field in its systems to ensure a number no longer receives calls, so there is no need for training on this terminology in hand-typed notes. Guarisco Decl. ¶ 18; Gregoire Decl. ¶ 13. In any event, Care Managers have used terms like that in a variety of situations. *Id.* The only way to potentially determine what these Care Managers meant when they used such terms is to start by individually reviewing the CGX notes for an SNP member to

try to understand what the phrase "wrong number" may have meant in the context of the note. And that is only the beginning. As discussed below, manually reviewing recordings, taking witness testimony, and serving a variety of subpoenas is also required.

In any event, reviewing a tiny fraction of those hand-typed CGX notes reveals that Humana employees used the phrase "wrong number" in a wide variety of situations, including many that show Humana reached or may have reached a number it had permission to call. For example, some CGX freestyle notes show that the Care Manager reached the right person who mentioned something on the call about how they "wrong number," but not that Humana had reached a wrong number. One CGX note from August 2020 shows that the Care Manager reached a member named Michelle C. (who fully authenticated her identity), and wrote that "SS accidently *gave mbr the wrong number* for area agency on aging." Guarisco Decl. ¶ 24 (emphasis added).

Other notes show many similar examples where individually reviewing a CGX note shows it reflects right party contact. *Id.* ¶ 25 ("wrong number" appears to be typo); ¶¶ 26-28 ("wrong number" in note indicates Humana reached family member); ¶ 29 ("wrong number" but Humana reached a member's friend); ¶ 30 ("wrong number" but Humana called nursing home where member resides); ¶ 31 ("wrong number" but note indicates Humana did <u>not</u> call that number); ¶ 32 ("wrong number" for one number but note shows good contact at another number); ¶ 33 ("wrong number" but note indicates member may just have not been available at the time of the call); ¶ 34 (note indicates number is "<u>not</u> the wrong number"); ¶ 35 (one note indicates "wrong number" but subsequent note shows same number is likely right number).

Testimony from Humana employees who call special needs members and type notes in CGX likewise confirms they use the term "wrong number" in a variety of ways. Some used it when they reached the *right* person who falsely stated the wrong number anyway. *See, e.g.*, Daugherty Decl. ¶ 15 ("These people may start the call saying wrong number, but then later give me information that shows the number is a good contact for the member."). Others use it when they speak to someone "in a hurry or that can't speak at the moment," or the care manager reaches "someone other than the member, including family or someone at a care facility." Benson Decl.

¶¶ 16-17; Daugherty Decl. ¶¶ 16-17; Gregoire Decl. ¶¶ 17-18. This is a *routine* issue, including because people often say "wrong number" simply to avoid calls.

### D.     Determining Whether the Phrase "Wrong Number" Sometimes Is Accurate in a Hand-Typed Note Requires Individually Reviewing Call Recordings.

A review of call recordings is similarly required to determine if the CGX note may reflect a call to a number that Humana lost consent to call. Reviewing a tiny fraction of call recordings confirms this point. For example, a recording of the call documented in the CGX note with the search term "wrong number" indicates that the Care Manager reached the member's "daughter, Laine." Humana Declaration ¶ 41. Whether the member or his daughter provided the daughter's number to Humana with her consent is not clear from the note or the recording. *Id.* Another example shows that a number a CGX note indicated may be a "wrong number" for one member may be a good contact number for *other* members. *Id.* ¶¶ 44-45. A homeless shelter, one circumstance where this may occur, told one Care Manager that the person Humana was trying to reach was just "in a meeting." *Id.*

In other cases, call recordings show that a number a CGX note previously indicated was a "wrong number" may in fact be a right number. For example, a CGX freestyle note from May 2022 for member Derrick M. indicates that a Care Manager reached a "wrong number" ending in 0572. A recording of a call with the same number from several months later, in February 2, 2023, shows that the 0572 number is likely a right number for the member. The Care Manager reached someone who identified himself as the member. The Care Manager asked, "Do you have maybe 15 to 20 minutes so we can talk about your health?" Another recording of a call with the same number from February 15, 2023 indicates that the member completed a review of his healthcare issues during a call. *See generally* Humana Declaration ¶ 42.

There are ***many*** other examples too, and they are drawn from just a fraction (less than 1%) of the recordings that correspond to the calls documented in CGX notes produced here. *Id.* ¶ 37.

### E. Determining Whether a Call Was Really to a Wrong Number and Person Also Requires Individual Interviews of the People Who Own the Number.

Interviews with (or depositions of) individuals who interfaced with these Humana Care members are required to determine what they mean by "wrong number," and copious follow-up discovery and subpoenas would be necessary to test those persons' veracity.

Humana obtained 14 declarations from various people whose numbers appear in CGX notes containing the term "wrong number," Plaintiff's list of about 23,000 numbers that allegedly received wrong number prerecorded voice calls, or both. These declarations and interviews variously confirm that figuring out the handful of occasions Humana actually called a number it lost consent to call would require a trove of individualized analyses.

During one interview, an SNP member confirmed that she received calls from Humana and that none of them were "wrong," even though CGX has a "wrong number" freestyle note for her anyway. Dreama D. Decl.¶ 3. Several other interviews indicated that the Humana Care member didn't reach a "wrong number." Mr. Joseph C. explained: "After my mother became a Humana member, I or my mother (or both) gave the 8764 number to Humana as a contact number for my mother's account. I did so to help my mother, including to help her by getting calls on her behalf." Joseph C. Decl. ¶ 4. One interview with a nursing home administrator—also associated with a "wrong number" freestyle note—confirmed that he cared for the SNP member and consented to receive calls for her, and that that "[m]ultiple . . . employees . . . might answer []his number at any given time." Brian E. Traxler Decl. ¶ 4; *see also* Beverly B. Decl.; Christy S. Decl.; Connie G. Decl.; Delaney T. Decl.; Dreama D. Decl.; Joseph C. Decl.; Kimberly M. Decl.; Luis S. Decl.; Mariela M. Decl.; Rose B. Decl.; Sonia A. Decl.; William F. Decl.

Humana's counsel interviewed dozens more such persons who had similarly said they shared their number with Humana as a point of contact for a Humana member. Keilson Decl. ¶¶ 9, 11; Meeler Decl. ¶¶ 8, 10; Moore Decl. ¶¶ 9-12; Leonard Decl. ¶¶ 8-11.

**F.    Plaintiff Files a Class Action Against Humana After It Accidentally Reached Him and then Falsely Testifies at Deposition About the Calls.**

Between 2016 and 2018 the number 706-455-3020 belonged to Humana Member Debra L. Tracfone 15. Debra L. was enrolled in Humana's SNP, so Humana attempted to contact her to complete her HRA to comply with federal law. At some point, Debra L. stopped using that number but didn't tell Humana. In July or August 2018, Plaintiff requested a new number from his prepaid cellphone service provider, Straight Talk Wireless. D. Elliot Depo., p. 29. The number he was assigned, 706-455-3020, had previously belonged to Debra L. Because Debra L. (or one of her caregivers) didn't tell Humana that her number had changed, Humana inadvertently reached Plaintiff when it called to complete Debra L.'s HRA in February 2022.

Despite this phone number reassignment, Plaintiff never told Humana to stop calling him. *See* ECF Nos. 113 at 13-14 & 142 at 8-9. Rather, he filed a class action lawsuit seeking millions of dollars in damages, claiming that Humana sent prerecorded "wrong number" calls to him and others in violation of the TCPA. Complaint; ECF No. 129 at 3; Ex. A, Elliot Dep. at 65-91.

At deposition, Plaintiff falsely testified about the calls in an attempt to inflate his damages. Citing his own deposition, he claims he "received 17 additional prerecorded calls" through April 28th, 2022 after informing Humana that he wasn't Debra L., the SNP member Humana was trying to reach. ECF No. 129 at 4; *see also* ECF 114-1 at 5 (claiming Plaintiff "received at least 22 illegal prerecorded messages"). The undisputed records from Plaintiff's own cell phone company, Tracfone, show that Plaintiff's testimony is false, and that he received, at most, three PRVs. *See* ECF No. 113-2.A at Tracfone 14;[1] Ex. A Elliot Dep. at 91:21-93:15. *Infra* at 32-34.

Because it obviously is not Humana's intent to reach Plaintiff, but instead its member or a caregiver, Humana tried to resolve Plaintiff's claim by offering far more than his full "damages" under the TCPA. Ex. A, Elliot Dep. at 117:16-118:23. But Plaintiff's counsel ***never conveyed*** that

---

[1] Humana's number, (866) 868-5092, appears seven times in these records: (1) February 8, 2022, a recorded live conversation, ECF No. 112-1.E at HUM 2; (2) March 4, 2022, a prerecorded voicemail, ECF No. 113-2.C at DE 100; (3) March 29, 2022, a prerecorded voicemail, ECF No. 113-2.D at DE107-108; (4) March 31, 2022, a call from Plaintiff to Humana; (5) April 1, 2022 at 4:22pm, a call from Humana to Plaintiff; (6) April 1, 2022 at 4:23pm, a call from Plaintiff to Humana; and (7) April 1, 2022 at 4:24 pm, another call from Plaintiff to Humana.

offer to him. *Id.* They instead continued to pursue this class action on the wrong theory that Humana lacked consent for any calls except where the SNP member picked up, hoping to use the expense of class litigation as a tool to extract millions in fees. Motion at 3.

But, as discussed above, "wrong number" in Humana's records rarely means "no consent," and it's impossible to determine when that is the case without answering many individual questions unique to the circumstances of every member and every call. Ignoring that reality, Plaintiff now seeks to certify a putative class of non-"current account holders" that Humana allegedly called on their cellphones with prerecorded voice:

> All persons or entities throughout the United States (1) to whom Humana placed, or caused to be placed, a call (2) directed to a number assigned to a cellular telephone service, but not assigned to a current account holder of Humana (3) in connection with which Humana used an artificial or prerecorded voice, (4) four years from the filing of this action through the date of class certification.

*Id.*

### G.    Plaintiff Uses a Flawed Process that Can't Identify True Wrong Number Calls.

To support his class certification theory, Plaintiff relies entirely on a report from Anya Verkhovskaya, a retired nurse that courts in similar TCPA cases have excluded at least a half dozen times. ECF No. 114-12; *see also e.g.*, *Carroll v. SGS Auto. Servs., Inc.*, 2020 WL 7024477, at *5 (M.D. La. Nov. 30, 2020) ("Verkhovskaya's methodology is insufficiently reliable and of limited utility"); *Davis v. Cap. One, N.A.*, 2023 WL 6964051, at *11 (E.D. Va. Oct. 20, 2023) (excluding Verkhovskaya's expert testimony in TCPA class action for failing to "identify members of the proposed class with a sufficient—or any—degree of reliability or feasibility"). Ms. Verkhovskaya, in turn, bases her opinions on a declaration submitted by Ms. Peters-Stasiewicz: a non-percipient witness who Plaintiff doesn't even offer as an expert. *Id.*

Plaintiff's improper declarants (which Humana will move to exclude in a forthcoming motion) purport to offer a four-step process to identify true wrong numbers that Humana called with prerecorded voice messages.

First, Plaintiff "start[s] with the records of the CGX Notes" and narrows them to "records with call notes that contain" the term "wrong number" or similar. ECF 114-9 ¶ 8.a; *see also* ECF 114-1 at 6-7 (describing reliance on CGX notes) *see generally* Daley Rep. According to Plaintiff and his pseudo-expert Peters-Stasiewicz, these records identify the date Humana reached a true wrong number it no longer had consent to call. ECF 114-9 ¶ 8.a; *see also* ECF 114-1 at 6-7; Ex. B, Peters-Stasiewicz Dep. at 25:8-21; Ex. C, Verkhovskaya Dep. at 9:5-10:25.

Second, Plaintiff takes the Humana member ID related to the CGX note and uses data from *another* Humana system (called hCAT) to "identify which telephone numbers" had a call that "connected to a Humana associate" on the "same date." ECF 114-9 ¶ 8.b; Ex. B, Peters-Stasiewicz Dep. at 25:8-28:5; *see also* Ex. C, Verkhovskaya Dep. at 9:5-10:25. The numbers this process pulls from hCAT often aren't mentioned at all in CGX notes with the term "wrong number." Daley Rep. ¶¶ 82, 124. And when there are multiple numbers in hCAT for a member, he appears to have arbitrarily taken the *first* number listed. Daley Rep. ¶ 83; Ex. B, Peters-Stasiewicz Dep. at 25:8-28:5; *see also* Ex. C, Verkhovskaya Dep. at 9:5-10:25. In other words, Plaintiff ignores the phone numbers in CGX notes with the term "wrong number" and selects numbers from a *different* system that are often *right* contact numbers for members or consenting associates. Daley Rep. ¶¶ 82-84, 124; Ex. B, Peters-Stasiewicz Dep. at 25:8-28:5, 31:2-22; Ex. C, Verkhovskaya Dep. at 25:4-7.

Third, Plaintiff then takes the numbers he pulled from hCAT and identifies "the calls with a status value of '92,'" which indicates Humana attempted to send a PRV to the number, "after the date" of the hand-typed CGX note with the term "wrong number" in it. ECF 114-9 ¶ 8.c. Plaintiff does nothing to determine whether the number *actually received* a PRV. Daley Rep. ¶ 36.

Fourth, Plaintiff claims that his "expert" can—at some date *after* certification—use a "reverse append" (or look-up) to determine which of the purported "wrong numbers" on Ms. Peters-Stasiewicz's list are not associated with Humana "account holders." ECF No. 114-12 at 8-15. She then claims that she can identify and notify (via email) putative class members for purposes of class notice by using "additional data enhancement to locate potential class members' names and addresses, including . . . performing a standard historical reverse append process." *Id.*

13

Ms. Verkhovskaya doesn't fully explain how her "reverse append" will gather information from "data providers." *Id*. Nor does she identify the providers she intends to use. Ms. Verkhovskaya instead states that she would take the data provider's information and use it to subpoena cell phone carriers for each number's contact information. ECF No. 114-12 at ¶¶ 48-58. She would then use that process to somehow determine which phone numbers are associated with non-account holders and included within the class. *Id*. This process could, at best, identify subscribers or authorized users, but not customary users who have the legal authority to consent to receive calls at the number.[2]

Ms. Verkovskaya doesn't apply her purported method to even a single phone number to prove that it can work either. If she had, she'd see that it ***fails to even identify Plaintiff***. Daley Rep. ¶¶ 98, 117, 138. Her process likewise would fails for other putative class members. *Id.* ¶¶ 118-126. And although Ms. Verkhovskaya acknowledges that her process "will likely result in providing notice to multiple persons for each potential violation," she offers no solution to solve that dispute or determine which claims are valid. Daley Rep. ¶ 64.

### H. Plaintiff Expert's Prior Work in His Case Highlights Her Unreliable Methodology.

Plaintiff's experts' own prior work in this case shows how unreliable Plaintiff's four-step process is to identify true wrong number calls. Plaintiff disclosed in discovery a process that identified around 8,000 purported "wrong numbers" Humana called with prerecorded messages. *See* ECF No. 112 a 6-8. That process did not use any CGX data. Plaintiff now abandons his original methodology entirely and relies on new opinions (and methodologies) that he submitted for the first time with his certification motion. This new method purports to identify about 23,000 wrong numbers Humana called with prerecorded messages. *See* ECF No. 114; *see* Ex. B at 8:24-9:7 & ECF No. 114-9, Dec. C. Peters-Stasiewicz. *Id.* Despite claiming that Plaintiff's original

---

[2] For example, John Smith could have a plan with seven numbers that various people use. These people, who may be non-members, could consent to receive calls at those numbers about a member's plan. Verkhovskaya offers no way to identify these people or numbers.

methodology was "reliable" and "efficient," *only 255 phone numbers overlap between Plaintiff's old and new methodology* (less than 1%). Daley Rep. ¶ 55.

> **I.    Plaintiff Proposes Using Claim Forms to Individually Ask Class Members Whether Humana Is Liable to Them.**

Finally, after completing Plaintiff's four-step process, his expert says that she intends to send putative class members "administration forms" that ask them a series of individualized questions to determine if they even have claims against Humana, including: (1) "[i]f they received a wrong number call from Defendant," (2) "[w]hether they share the telephone number with anyone," and (3) "[w]hether they share the [Humana] account with anyone else." All these questions directly relate to whether Humana is liable to the class member, not just the amount of each putative class member's supposed damages. For example, Humana wouldn't be liable to a class member who did not "receive a wrong number call."

## III.    <u>LEGAL STANDARD: RULE 23'S STRICT REQUIREMENTS</u>

Class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). To safeguard this exception, Rule 23 imposes strict requirements for class certification. *See In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 722 F.3d 838, 850 (6th Cir. 2013).

Certification must therefore be denied unless Plaintiff proves that Rule 23(a)'s requirements are met, including all of the following: "numerosity, commonality, typicality, and adequate representation." *In re Whirlpool*, 722 F.3d at 850. Relevant here, "[t]o qualify for certification under Rule 23(b)(3), [Plaintiff] must meet two requirements beyond the Rule 23(a) prerequisites: Common questions must 'predominate over any questions affecting only individual members'; and class resolution must be 'superior to other available methods for the fair and efficient adjudication.'" *Bond v. Antero Res.,* 328 F.R.D. 187, 191 (S.D. Ohio 2018).

"Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact,

etc." *Dukes*, 564 U.S. at 350; *see also In re Whirlpool*, 722 F.3d at 851 ("[T]he class determination should be predicated on evidence."). Certification is proper only if "the trial court is satisfied, after a rigorous analysis," that plaintiff has carried his burden to show that *all* of Rule 23's independent requirements are met. *Dukes*, 564 U.S. at 350–51 (2011).

Plaintiff also must prove that the members of his proposed class are ascertainable. "Ascertainability is satisfied when the 'class description [is] sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member'" with objective criteria. *Cohen v. Allegiance Admin.*, 2024 WL 4481483, at *3 (S.D. Ohio Oct. 14, 2024).

## IV.    ARGUMENT: THE CLASS CANNOT BE CERTIFIED FOR MANY REASONS

### A.    Plaintiff Doesn't Offer Evidence to Support Class Certification.

The Court should deny Plaintiff's motion for a simple preliminary reason: Plaintiff doesn't offer any evidence to support his certification bid. His entire evidentiary basis and class theory hinges on the report of his sole "expert," Ms. Verkhovskaya. But he admittedly doesn't offer her opinions to support class certification: "Verkhovskaya's role is to explain how notice can be efficiently administered across the potential class." ECF No. 130 at 3. Class notice is irrelevant right now, however, because the only question currently before the Court is whether a class can be certified at all. Plaintiff's decision to submit evidence he concedes is relevant only to class notice—but not certification—alone requires denying his motion. Another court did exactly that when it ignored Ms. Verkhovskaya's declaration. *See e.g.*, *Sapan v. Yelp, Inc*., 2021 WL 5302908, at *3 (N.D. Cal. Nov. 15, 2021) ("Verkhovskaya's declaration *is of no utility to the issue of certification*" because she "offers no opinions about numerosity, or any other Rule 23 element") (emphasis added).[3]

---

[3] Humana has separately moved to exclude Ms. Verkhovskaya as an inadmissible expert and will also move to exclude her inadmissible declaration filed with Plaintiff's certification motion. If the Court excludes Ms. Verkhovskaya's testimony, the Court should deny Plaintiff's request for class certification for that reason alone. *See e.g.*, *Kondash v. Kia Motors*, 347 F.R.D. 197, 206 (S.D. Oh. 2020) (denying motion for class certification based on exclusion of plaintiff's the expert witnesses).

**B.      Plaintiff Cannot Show that Common Questions Predominate.**

Class certification also fails because Plaintiff does not and cannot establish the most important Rule 23 requirement—predominance. This requirement asks whether common "questions of law or fact" "predominate over any questions affecting only individual members." *Sandusky Wellness v. ASD Specialty Healthcare*, 863 F.3d 460, 468 (6th Cir. 2017) (describing predominance as "demanding"); *see also* Fed. R. Civ. P. 23(b)(3). The predominance requirement ensures that the Court can proceed with a "trial on the merits" where the named plaintiff can testify about the experiences of the entire class to establish liability, without needing to answer case-by-case questions about each class member's individual experiences. *Id.* (cit. omitted).

Here, Plaintiff cannot establish that common questions predominate because the most important pre-requisite to liability—whether Humana had consent for any particular call—is an inherently case-by-case question that requires an individual analysis. Indeed, consent is a complete defense to Plaintiff's TCPA claims, and the "voluntary provision of a [phone] number [ ] by a message-recipient to a message sender, constitutes express consent[.]" *See* § 47 U.S.C. 227(b)(1)(A); *Baisden v. Credit Adjustments, Inc.,* 813 F.3d 338, 341-42 (6th Cir. 2016); *see also Licari Fam. Chiropractic v. eClinical Works*, 2019 WL 7423551, at *7 (M.D. Fla. Sept. 16, 2019) (collecting cases).  Here, Humana had consent to call every number provided to it by an SNP member (or from someone on their behalf). Guarisco Decl. ¶ 13; *see also* Daugherty Decl. ¶¶ 8-9; Benson Decl. ¶¶ 8-9; Gregoire ¶¶ 9-10. Humana is thus entitled to prove—at trial—that each call at issue was made with that consent. *See* Gensler & Mulligan, 1 Federal Rules of Civil Procedure, Rules and Commentary, Rule 23; *Shamblin v. Obama for Am.*, 2015 WL 1909765, at *7 (M.D. Fla. Apr. 27, 2015) (recognizing "constitutional right to a jury determination as to whether any person consented to receiving calls to their cellular telephone") (cit. omitted).

For this reason, courts do *not* "regularly certify[y]" wrong number TCPA class actions, as Plaintiff misrepresents in his motion (at 2). Quite the opposite: Courts routinely deny certification under even less individualized facts—particularly in cases involving calls about healthcare, which often involve individual questions about whether a caretaker consented to receive calls for

someone else. *See, e.g.*, *Morgan v. Orlando Health*, 2021 WL 12100347, at *6 (M.D. Fla. Dec. 8, 2021) ("[T]here are many reasons why the patient or guarantor giving consent to call may be an authorized agent . . . ***the patient may be cared for by someone else*** and has permission to provide the caretaker's phone number."); *Morgan v. Adventist Health Sys./Sunbelt, Inc.*, 2020 WL 1674307, at *3 (M.D. Fla. Jan. 15, 2020) (denying certification because "***consent may be given by a person other than the patient consenting to treatment***"); *Sliwa*, 333 F.R.D. at 279–80 ("The fact that the classes are limited to non-customers whose phone numbers were assigned a [bad phone] code does not prevent these individualized inquiries, as ***Defendants' evidence demonstrates that a non-customer may consent to receive calls on behalf of a customer***."); *Bridge v. Credit One Fin.*, 294 F. Supp. 3d 1019, 1040 (D. Nev. 2018) ("[l]imiting the class to subscribers who are not account holders does not" solve consent issues); *Davis v. AT&T Corp.*, 2017 WL 1155350, at *5 (S.D. Cal. Mar. 28, 2017) ("Even if Defendant made a call to a person who was not a customer at the time of the call, that would not eliminate the need for an individualized inquiry."); *Warnick v. Dish Network LLC*, 301 F.R.D. 551, 559 (D. Colo. 2014) ("The fact DISH had *consent* to call a particular number does not turn on whether the called party was the actual, *named customer* in DISH's records."); *Wilson v. Badcock Home Furniture*, 329 F.R.D. 454, 456 (M.D. Fla. 2018) (similar, and rejecting Ms. Verkhovskaya's "expert").

Plaintiff nevertheless contends that he can prove on a class-wide basis that Humana lost consent when it called non-"current account holders" and thus dialed "wrong numbers." To do that, he uses a multi-step process proposed to his supposed expert by his counsel. But that process fails at every turn. As explained above and below, overwhelming evidence shows that Plaintiff's proposed method introduces countless individual questions of consent that the Court could only resolve with series of mini-trials. *See Revitch v. Citibank, N.A.*, 2019 WL 1903247, at *4 (N.D. Cal. Apr. 28, 2019) (denying certification because defendant "put forward an evidentiary basis from which to conclude that adjudicating whether or not members of the class consented to its calls lacks a common method of proof.").

Individual questions of consent are merely the most glaring, unsolvable problem that

preclude the certification of any class. But there are more individual questions about several other issues—including whether class members actually received prerecorded messages Humana attempted to deliver—independently show that Plaintiff can't meet his burden to establish predominance. The Court should deny certification for this reason alone.

### 1. Plaintiff's First Step Fails Because Individual Review of Notes and Call Recordings Is Necessary to Try to Answer Questions of Consent.

As discussed above, Plaintiff begins trying to solve the problem of consent with hand-typed CGX notes containing the term "wrong number." Guarisco Decl. ¶ 22; Benson Decl.; Daugherty Decl.. But that starting point is fatal. Humana gives its Care Managers—and there are hundreds of them—discretion to note the calls as they see fit. *Id.* Care Managers end up using the phrase "wrong number" (or variations) in many ways a result. And even if every "wrong number" note was an exact dictation of what a call recipient said, that *still* wouldn't mean Humana didn't have consent to make that call; just that the person who picked up said "wrong number" because, for example, the member wasn't available or the person who answered didn't want to talk.

A review of just a small fraction of these notes show that Care Managers use "wrong number" to: (1) describe what happened on any given call, like if a member said they had a wrong number for someone the member was trying to reach (Guarisco Decl. ¶ 24); make a typographical error: "If you develop symptoms, **please contwrong number** act your doctor or use available telemedicine services" (*id.* ); (3) indicate *right* party contact, like a family member, friend, or nursing home (*id.* ¶¶ 25-30); or even (4) show that Humana *didn't* call a number that it previously identified as "wrong" (*id.* ¶ 31). Other Managers use that term to mean they didn't contact a number previously believed to be "wrong," or to simply say that the SNP member (or family member) was "in a hurry" and thus couldn't talk. Benson Decl. ¶¶ 16-17; Daugherty Decl. ¶.

Still others use it when they reach the *right* person who falsely stated they called the wrong number anyway. *See, e.g.*, Daugherty Decl. ¶ 15 ("These people may start the call saying wrong number, but then later give me information that shows the number is a good contact for the member."). *See generally supra see also Tillman v. Ally Fin., Inc.*, 2017 WL 7194275, at *7 (M.D.

Fla. Sept. 29, 2017) (recognizing people say "wrong number" to just avoid the call); *Wilson*, 329 F.R.D. at 459 (same). People do that for many reasons, including because they just too busy to take a call or take the time to understand who is calling.

Setting aside that Plaintiff's use hand typed CGX notes is flatly wrong, these notes cannot be used to prove that Humana *actually called* a "wrong number" because they are multi-layer hearsay, which ***cannot* be used at trial** to prove Humana lacked consent to make the calls at issue. *See United States v. Jenkins*, 499 F. Supp. 2d 1268, 1285–86 (M.D. Fla. 2007) (bank records showing notes about telephone conversations with customers inadmissible hearsay); *Neagle v. Ill. Tool Works, Inc.*, 2011 WL 13173913, at *5 (N.D. Ga. Feb. 11, 2011) (business records reflecting what employee said about what third party said inadmissible hearsay).

Individually analyzing call recordings further establishes that Plaintiff can't establish predominance. Reviewing just a tiny fraction of these recordings—less than 1%—reveals a host of reasons why. For example, sometimes a recording of the call documented in the CGX note with the search term "wrong number" indicates that the Care Manager reached a family member. Humana Declaration ¶ 41. Whether that family member consented to receive calls for the member is unclear from the recording. *Id.*

In other cases, call recordings show that a number a CGX note previously indicated was a "wrong number" may in fact be a *right* number. As discussed above, the CGX note from May 2022 indicates that a Care Manager reached a "wrong number" ending in 0572. *Id.* ¶ 42. Reviewing three subsequent call recordings, however, shows that Humana likely reached a right number, including because the person who answered said it was "okay" for Humana to call him later. *Id.* In another recording, the same member actually completed a review of his healthcare issues, which strongly suggests the number was a right number all along. *Id.*

Other recordings show that a number a CGX note indicated may be a "wrong number" for one member may be a good contact number for *other* members. *Id.* ¶¶ 44-45. For example, a homeless shelter told one Care Manager that the person Humana was trying to reach was just "in a meeting" even though a CGX note indicated a "wrong number." *Id.* Trying to answer whether

any given call was truly to a wrong number in circumstances like this would require reviewing both CGX notes and call recordings with that number to understand the context of the call.  Did Humana have the right number for one of several members who might be in the same homeless shelter at the time of the call or not?[4]

In sum, attempting to decipher whether any given call was to a right or wrong number would require reviewing endless CGX records *and* "hundreds of thousands of recordings." Humana Declaration ¶ 47. This precludes Plaintiff from showing that common questions predominate over questions affecting individual class members. *See Sliwa*, 333 F.R.D. at 278-80 (denying certification on wrong-number TCPA class action, including because disposition codes were used in a variety of ways).  Can Plaintiff take the stand at trial and answer questions about what the term "wrong number" meant in tens of thousands of CGX notes that individually relate to tens-of-thousands of class members? Of course not. Can Plaintiff take the stand at trial and answer questions about whether call recordings show each and every purported "wrong number" may in fact have been a right number at the time of a prerecorded call? No. He has no personal knowledge about these individual questions, and could never testify about hundreds of thousands of such records raising individual questions about each class member.

### 2.    One-by-One Witness Examinations and Follow-Up Discovery Are Necessary to Determine if Humana Called a True "Wrong Number."

The Court would similarly need to individually interview every owner of the numbers on Plaintiff's purported "wrong number" list to see if the number is truly wrong—or may be right. ***Thirteen declarations*** Humana obtained proves it. These declarations independently confirm that not only does Plaintiff's first step require answering individual questions that defeat predominance, but also that his entire process fails and cannot be used to certify any class.

---

[4] Logs of member verifications on inbound calls underscore the point further. Humana specifically reviewed the 23,682 numbers Plaintiff claims are "wrong" and found that *hundreds* of them recently called into Humana and successfully authenticated their identity—suggesting these "wrong" numbers are not just right but actively being used by the SNP member to speak with Humana. Guarisco Decl. ¶ 47. This data is only available for the numbers that happened to call into Humana and successfully authenticated their identities. *Id.* In other words, this data highlights hundreds of numbers where there is an individual question about whether they are right numbers, but there is no way to determine how many other numbers may have similar issues, except the member happened not to call in to Humana (e.g., because the member preferred to communicate through Humana's online portal).

For one, all these declarants confirmed they didn't receive any "wrong number" calls from Humana. One was the SNP member Humana was trying to reach and claims she never even told Humana it reached a "wrong number." Dreama Drake Decl.¶ 3. Many others received calls trying to reach the SNP member they helped or cared for as well:

1.   "After my mother became a Humana member, I or my mother (or both) gave the 8764 number to Humana as a contact number for my mother's account. I did so to help my mother, including to help her by getting calls on her behalf."  Joseph C. Decl. ¶ 4.

2.   "I do not recall receiving any phone calls from Humana. My mother generally lists me as an emergency contact, so it is likely that she gave Humana my phone number." Christy S. Decl. ¶¶ 4-6

3.   "When my grandmother first became a Humana member, she provided the 9064 number to Humana as a contact number for her account. She had my consent to do so." Delaney T. Decl. ¶ 4.

4.   "After Ralph became a Humana plan member, I or Ralph (or both) gave the 2069 number to Humana as a contact number for his account." Rose B. Decl. ¶ 4.

5.   "After my son became a Humana member, I gave the 6685 number to Humana as a contact number for my son's account. I did so to help my son, including to help him by getting calls on his behalf." Beverly B. Decl. ¶ 4.

*See also* Mariela M. Decl. ¶ 4; Connie G. Decl. ¶¶ 4-5; Kimberly M. Decl. ¶ 4.

One of these declarants is even a nursing home administrator who provided Humana with the home's number to assist the SNP member with her special healthcare needs. Brian T. Decl. ¶ 4. ("[The nursing home] gave the 0771 number to Humana as a contact number for LB's Humana account with LB's responsible person's permission."). "***Multiple . . . employees . . . might answer this number at any given time***," any one of which could have incorrectly told Humana they reached a wrong number. *Id.* ¶ 2 (emphasis added). And several declarants don't recall receiving *any* calls from Humana, despite their *admitted* affiliation with an SNP member and a "wrong number" CGX note.  *See* Christy S. Decl. ¶¶ 3-5; Luis S. Decl. ¶¶ 3-4.

All of these declarants own phone numbers that are on Plaintiff's list of 23,682 purported "wrong numbers," in CGX freestyle notes that contain the term "wrong number," or both. These

individuals had different experiences with Humana, all confirming or at least strongly suggesting they consented to Humana's calls. "[W]hen the defendant provides specific evidence showing that a significant percentage of the putative class consented to receiving calls, issues of individualized consent predominate." *Tomeo v. CitiGroup*, 2018 WL 4627386, at *8 (N.D. Ill. Sept. 27, 2018) (emphasis added). These declarations are more than enough, and confirm it would be reversible error several times over to certify a class here. *See Blake Tishman v. Baptist Health*, 2019 WL 3890506, *18 (S.D. Fla. June 10, 2019) (finding sufficient evidence of consent in *just three* putative class member declarations); *Corp. v. Singer Fin. Corp.*, 2018 WL 4030699, at *5 (E.D. Pa. Aug. 23, 2018) (denying class certification based on deposition testimony of just two employees regarding consent).

That's particularly true given the upshot of these declarations: For every single number, the subscriber and any regular user of the numbers would need to be cross-examined, and so would the member. So would potentially others, like housemates, to test their veracity. Document subpoenas would be necessary for that purpose too. Only then could the Court even *potentially* conclude that Humana lacked consent for any particular call. No such case could ever be tried as a class action.

### 3.     Plaintiff's Second Step, Relying on Phone Numbers in Another Database (hCAT), Confirms That Individual Questions Predominate.

Plaintiff's second proposed step for resolving the consent issue compounds the individual issues even further. That's because he proposes using the member ID in CGX to identify phone numbers that may have received "wrong number" calls in a different system called hCAT. But that step is flawed from the start because he's attempted to generate a list of alleged "wrong" telephone numbers without considering "whether the process [he] used to purportedly identify prerecorded calls to true wrong numbers accurately does so." Daley Rep. ¶¶ 64, 84. He instead just assumes that the call in hCAT was to the same phone number mentioned in CGX, even though a "wrong number" notation may only be listed with one of *multiple* CGX phone numbers. *Id.* ¶¶ 82-84. A sample of that data—which required a careful, individualized review—showed that the phone

numbers in hCAT **didn't match those in CGX as much as 29% of the time.** *Id.* ¶¶ 82-84, 124 Some hCAT numbers *never appeared in CGX at all*, underscoring why individualized issues are inevitable here. *Id.* ¶ 83. In other words, Plaintiff starts with a hopelessly unreliable set of "wrong number" notes, and then makes the individual problems worse by not even analyzing the numbers associated with those notes for purposes of determining the numbers in his proposed class.

### 4. Plaintiff's Third Step, Identifying Numbers Humana Attempted to Send Prerecorded Messages to, Confirms Individual Questions Predominate.

Plaintiff's third step furthers the problems even more. That step involves taking the hCAT numbers from step 2 and figuring out whether Humana attempted to send a prerecorded message (associated with a code "92") to that number "after the date" of the freestyle note in CGX with the term "wrong number." ECF 114-9 ¶ 8c; *see* above  (describing Plaintiff's third step).

But identifying if a prerecorded message Humana *attempted* was *actually* delivered raises individual questions, for example. Plaintiff's perjured testimony highlights why. There's no dispute that Humana can only be liable for a prerecorded message that was actually delivered to a phone. *Sliwa*, 333 F.R.D. 255, 281 n.21 (denying class certification because the fact that records indicated a PRV "should have played" did not establish that it did in fact play) (citing *Ybarra v. Dish Network, L.L.C.*, 807 F.3d 635, 641 (5th Cir. 2015)). Plaintiff pointed to Humana's "code 92" records to falsely testify that he received 22 prerecorded calls, but his own cell phone records confirm he got at most three *See* ECF No. 129 at. 3; D. Elliot Dep. at 90:25-91. *See* above.

Plaintiff's own claim thus also raises individual questions that will need to be answered for every class member. Did other putative class members block Humana's calls such that they didn't receive prerecorded messages Humana attempted to send? Will some falsely testify (or submit perjured claims forms) to inflate their damages too? All these issues bear on Humana's liability. Due process entitles Humana to (1) subpoena these putative class members' cell records, (2) depose each carrier about what they mean, and (3) cross-examine each subscriber about those records on the stand. *Shamblin*, 2015 WL 1909765, at *7 (recognizing due process right). There is

no class-wide way to resolve these issues with Plaintiff testifying for all class members. Plaintiff cannot establish predominance for this independent reason.

**5.    Plaintiff's Fourth Step, Using a "Reverse Append" Process, Confirms That Individual Issues Predominate.**

The fourth step in Plaintiff's proposed process is to use "reverse append" to determine which purported "wrong numbers" belong to non-Humana account holders. This step is irrelevant because it involves class notice, not certification, as discussed above. Setting that aside, Plaintiff's proposed reverse append confirms he can't establish predominance.

As a threshold matter, the vendors Plaintiff intends to use have ***disclaimed their own services*** for this purpose. Daley Rep. ¶¶ 115, 117; *See Carroll v. SGS Auto. Servs.*, 2020 WL 7024477, at *5 (M.D. La. Nov. 30, 2020) ("The Lexis database 'cannot be used to determine definitively the subscribers or customary users of a telephone number on a current or historical basis.") (cit. omitted).; Daley Rep. at ¶ 102-109. On top of that, Plaintiff's expert hasn't even attempted to apply the proposed reverse append method. That was intentional. Applying the reverse append, as Humana's expert has done, shows that it ends up ***excluding Plaintiff*** from the putative class because it associated him with his phone number over 20 years ago (in 1999), and then again 18 months after the Humana calls ceased. *See* DE 112 at 19-20.

In other words, Plaintiff's own process would not identify him as a class member who would receive notice. The same process would falsely identify others as class members even though they don't have any claim against Humana, including numerous declarants and thousands of others like them. *See generally* Daley Rep. So an individualized review of every reverse append would be required given how inaccurate the process is. And even after that, it still would leave Plaintiff no closer to identifying PRV calls made without consent. That's because, as described above, many SNP members have family members, friends, guardians, nursing homes, ministers, and homeless shelters who consented to receive calls on behalf of the member. That necessarily means that a member-call recipient name mismatch tells you nothing about consent. The reverse append process would not be able to account for this either. Daley Rep. ¶¶ 98, 117

6.     **Plaintiff's Proposal to Use Claim Form Solves Nothing.**

After completing all four, flawed steps of Plaintiff's process, he proposes sending claim forms to putative class members. *See* above. This proposed "self-attestation" process doesn't solve any of these individual questions either; it only compounds them further. Indeed, Plaintiff's self-attestation forms go to the heart of Humana's liability because they literally ask class members "[i]f they received a wrong number call." Daley Rep. ¶ 78. In other words, Plaintiff's proposed use of claim forms introduces "a case-by-case examination of each person's claim, the exact process a class identification mechanism is supposed to avoid." *Id.* ¶ 65.

Plaintiff could never establish predominance for this additional, independent reason. Humana has a due process right to call each member at trial—particularly given that Humana "could face up to $ 1500 per call." *Wilson*, 329 F.R.D. at 458 ("This amount is relevant both as an incentive for individuals to improperly enter the class and, as discussed more fully below, a danger that impacts due process protections for Defendant") (cit. omitted). And issues of memory would plague these forms because SNP program caters to the elderly and sick, including those with mild-to-severe intellectual disabilities or communication limitations. *See, e.g.*, *Carrera v. Bayer Corp.*, 727 F.3d 300, 309 (3d Cir. 2013) (concluding affidavits could not be used to ascertain a class because the named plaintiffs had difficulty remembering purchases) (cit. omitted); *Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc.*, 863 F.3d 460, 471–72 (6th Cir. 2017) (similar and cits. omitted); Decl. A. Benson ¶¶ 4, 9; Decl. T. Daugherty ¶¶ 4, 8. Another court has rejected Verkhovskaya's "self-attestation" process for these reasons, noting that the defendant has a "right to challenge" the answers on the proposed claim forms because they bear on its liability. *Sandoe v. Bos. Sci. Corp.*, 333 F.R.D. 4, 9 (D. Mass. 2019). Relying on such forms would be reversible error.

7.     **Plaintiff's Own Case and Prior Analysis Highlights Individual Issues.**

On top of all this, the two methodologies Plaintiff employed to determine if Humana called a wrong number confirm that individualized issues predominate. As described above, Plaintiff has twice claimed he has a "reliable" and "efficient" method to answer the same core question: Which

true wrong numbers did Humana call with prerecorded messages? Yet his two methods identified *totally different phone numbers*. Only **255 phone numbers—less than 1%—overlap between Plaintiff's old method (identifying 8000+ numbers) and new methodology (identifying 23,000+)**. *See* above; Daley Rep. ¶ 55. Two purportedly "reliable" methods shouldn't yield two totally different answers, let alone ones that differ by over twenty thousand phone numbers. Plaintiff doesn't even try to explain why that happened. He knows he cannot absent individual review of every call, and that dooms class certification for yet another reason.

Plaintiff's own case also highlights that individual questions predominate over common ones. First, as explained above, Plaintiff's perjured testimony about the number of calls he received demonstrates individual questions about whether prerecorded calls were actually delivered that would need to be repeated for every class member. *See* above.

Next, Humana contends that the emergency purposes exception applies to all HRA calls because they are intended to provide critical healthcare services to a vulnerable group. ECF No. 142 at 11-13. If that weren't the case, the emergency purposes exception would raise still more individual issues, as Plaintiff's case demonstrates. Even if a particular call wasn't an emergency, as he contends for his own calls,  another could have been. For example, if a particular member was in dire life or death need that a Humana HRA call could address. This happens all the time. "One example" is a member Humana "reached who was so disabled that they could not get out of bed, and the only person living with her was about to move out of state." Gregoire Decl. ¶ 8. "In situations like that," Humana will call Adult Protective Services so it can "investigate and help the member avoid a life-threatening crisis." *Id.*; *see also* Benson Decl. ¶ 7 (a diabetic was "running out of food"); Daugherty Decl. ¶ 7 (a member had "run out of all of her medications").

Plaintiff's incorrect argument[5] that the emergency exception wouldn't apply "after Elliot asked Humana to stop calling" could likewise only add to the individual issues that preclude certification. DE 129 at 13 (summary judgment opposition). Setting that aside, his argument

---

[5] Plaintiff didn't ask Humana "to stop calling." *See* ECF No. 142 at 8-9. Humana's policy and general practice is to mark a number as "invalid" when Humana confirms it is actually wrong number, and then no longer call that number.

underscores he can't show predominance. Even if the emergency "ends" after an alleged "stop" request, then the Court will need to evaluate the circumstance of *every* such request by *every* putative class member to determine if the request was both clear and sufficient to end the emergency. *Lindenbaum v. CVS Health Corp.*, 2018 WL 501307, at *2 & n.23 (N.D. Ohio Jan. 22, 2018) (discussing authority that stop request can end emergency in some cases).

Finally, Plaintiff claims the calls to him were "marketing" based solely on his testimony that when *he called* Humana one time, someone tried to sell him insurance. *See* ECF No. 142 at 7-8. The undisputed record about HRA calls Humana makes to members shows that they provide federally required healthcare services and don't sell anything. *See id.* at 4-5; *see also* Benson Decl.; Daugherty Decl.; Gregoire Decl. Even if calls to Humana like the one Plaintiff claims he made were relevant, they would only introduce still more individual questions: Did the person who answered Plaintiff or another putative class member's call try to sell anything on the call? There's no way to do that in "one stroke," precluding predominance for yet another reason. *Wal-Mart*, 564 U.S. at 350.

### 8.    Plaintiff's Cases Don't Apply.

Last, all the above easily demonstrates that the case law Plaintiff's relies on in his motion does not apply here. All those cases, for one, involved alleged calls to collect debts, not to provide a federally required healthcare service. In debt collection cases, phone number reassignment (from a consenting individual to one who may not have consented) is far more likely. *See Samson v. United Healthcare*, 2023 WL 6793973, at *1 (W.D. Wash. Oct. 13, 2023) (stating that the plaintiff mainly received calls from "Collections team"); *Wesley v. Snap Finance*, 339 F.R.D. 277, 298-99 (D. Utah 2021) (debt collection); *Head v. Citibank*, 340 F.R.D. 145, 153 (D. Ariz. 2022) ("past-due credit card account"); *Knapper v. Cox Commc'ns, Inc.*, 329 F.R.D. 238, 247 (D. Ariz. 2019) ("collect a past due residential account balance). Why? Individuals who can't afford to pay a bill owed to a defendant typically also fail to pay their cell phone bill, resulting in the reassignment of their phone number at the same time the defendant is calling to collect a debt. The same isn't true

of Humana's HRA calls, making Plaintiff's non-"current account holder" theory an even less reliable way to identify who received true "wrong number" calls.

Nor did any of those cases involve hand-typed freestyle notes. *Samson* involved a 'drop-down' list of call dispositions with preset meanings, for instance. 2023 WL 6793973, at *10 ("United employees can enter a disposition code"). So did the courts in all the other cases on which Plaintiff relies. *See also, e.g.*, *Wesley*, 339 F.R.D. at 298-99) (involving "primary disposition code[s]" and "call duration[s]", unlike here). In any event, courts have denied certification even in cases involving wrong number disposition codes instead of hand-typed notes. *Sliwa v. Bright House Networks, LLC*, 333 F.R.D. 255, 271 (M.D. Fla. 2019) (denying certification because not even call dispositions codes could reliably identify wrong number calls); *Hunter v. Time Warner Cable Inc.*, 2019 WL 3812063, at *16 (S.D.N.Y. Aug. 14, 2019) (same); *Revitch*, 2019 WL 1903247, at *2 (same).

Finally, not one of the defendants in those cases offered nearly as much evidence as Humana does here. *See, e.g.*, *Samson*, 2023 WL 6793973, at *10 ("United has put forth no evidence that the Court can use to determine whether this issue [intermediary consent] would defeat predominance).[6] In fact, ***no court has ever certified*** a wrong-number TCPA class action with this much evidence refuting the plaintiff's claims.

### C.    Plaintiff Cannot Establish Ascertainability.

Plaintiff likewise cannot show that the class is clearly ascertainable, an implicit requirement for class certification. *See Cohen v. Allegiance Admin., LLC*, 2024 WL 4481483, at *3 (S.D. Ohio Oct. 14, 2024) (citing *Cole v. City of Memphis*, 839 F.3d 530, 541 (6th Cir. 2016)). Unlike predominance, which focuses on whether **liability** can be established in "one stroke," ascertainability asks whether *membership in the class as Plaintiff defines it* can be determined in one stroke, without individualized inquiries. Thus, "[a]scertainability is satisfied when the 'class

---

[6] Plaintiff also cites *Sheean v. Convergent Outsourcing*, even though it was an agreed settlement, not a contested motion. 2019 WL 6039921, at *1 (E.D. Mich. Nov. 14, 2019).

description [is] sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member'" given objective criteria. *Id.*

In practice, this means that a class defined as "everyone on the attached list" may be *ascertainable*, even though it may be *uncertifiable* for other reasons. *See, e.g.*, *Bechtel v. Fitness Equip. Servs., LLC*, 339 F.R.D. 462, 478 (S.D. Ohio 2021) (finding that "[i]f plaintiffs' theory [were] ultimately successful on the merits, class members [were] objectively ascertainable from the known customer lists" but denying certification for a proposed class on predominance grounds). But when a class is defined with complicated prerequisites, like here, a plaintiff must prove that he can ultimately identify people who meet them. *See Pansiera v. Home City Ice Co.*, 341 F.R.D. 223, 230 (S.D. Ohio 2022) (noting "identification process may be complicated," but finding no ascertainable class where the plaintiff "ha[d] no plan for making [it] effective"). This case falls into the latter category, and Plaintiff cannot prove—with evidence—that he has a non-individualized way to identify people "to whom Humana placed, or caused to be placed, a call [] directed to a number assigned to a cellular telephone service, but not assigned to a current account holder of Humana." ECF No. 1, Complaint at ¶ 43.

First, under Plaintiff's class definition, only "persons . . . to whom Humana placed" certain calls are defined as class members. But Plaintiff doesn't say if those "persons" must be named subscribers or users of the phone numbers. This distinction is critical in TCPA cases like this one. A non-subscriber, customary user of the phone may consent to calls—a complete defense to liability—and it's impossible to identify them in any feasible way. *See, e.g.*, *Warnick v. Dish Network*, 301 F.R.D. 551, 559 (D. Colo. 2014) (failure to distinguish "user/subscriber of a phone" rendered class unascertainable); *Soulliere v. Ctrl. Fla. Inv.*, 2015 WL 1311046, at *4 (M.D. Fla. Mar. 24, 2015) (cit. omitted). That's particularly true here, where the record is full of examples of current Humana account holders using, but not subscribing to (or even belonging to a group plan for) phone numbers at which Humana contacted them. *See, e.g.*, Guarisco Decl. ¶¶ 26, 30.

Second, Plaintiff conditions class membership on the dialed number as being "not assigned to a current [Humana] account holder." To identify numbers of "non-account holders," Plaintiff

proposes looking for freestyle "wrong number" notes in CGX, searching a totally different database for live-call codes on the same day as the wrong-number note, and then collecting a phone number associated with the member's account number from the different database. This process fails miserably as explained above, easily distinguishing the primary case on which Plaintiff relies. *Wesley*, 339 F.R.D. at 288 (finding "wrong number" *codes*, not freestyle notes with the term "wrong number," sufficient for ascertainability); *see also Morgan*, 2021 WL 12100347, at *6 (denying certification in TCPA class action under more similar facts); Daley Rep. ¶¶ 33, 72-73, 124.

Third, Plaintiff has not proved that he has a non-individualized way to show when Humana "used an artificial or prerecorded voice," his final prerequisite of class membership, as explained above. Plaintiff's own case confirms that too, as also described above.

Plaintiff therefore cannot establish ascertainability for any one of these independent reasons, and that also precludes class certification. *See Young*, 693 F.3d at 538. *Pansiera*, 341 F.R.D. at 230 (no ascertainable class where the plaintiff "ha[d] no plan for making [a class-identification process] effective").

### D.    Plaintiff Cannot Prove Any of the Other Five Prerequisites to Certification.

Plaintiff also cannot provide any of the other five requirements for class certification under Rule 23(a) and (b): Commonality, adequacy, typicality, numerosity, and superiority.

#### 1.    Plaintiff Cannot Establish Commonality.

To begin, Plaintiff cannot establish commonality, or Rule 23(a)'s "predominance light" requirement. To show "commonality" Plaintiff must prove: (1) all class members "suffered the same injury"; and (2) that this common injury is "capable of classwide resolution." *Dukes*, 564 U.S. at 349-50. What matters to commonality "is not the raising of common questions—even in droves—but rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Id.*

Here, certification should be denied on this ground too because the "common questions" Plaintiff identified would either require "individualized proof" or would not truly resolve

31

Humana's liability. *See Shamblin*, 2015 WL 1909765, at *7 ("[Plaintiff's] ability to list some common questions does not satisfy commonality, because individualized proof will be required for each and every plaintiff, which defeats the purpose of class certification."). The primary issues central to liability here, as identified by Plaintiff, are: (1) whether Humana called non-customers; (2) with calls that played a PRV; (3) on a cellular phone; (4) for non-emergency purposes; and (5) "whether Humana is liable for the calls." ECF No. 114-1 at 11.

None of these questions will "generate common answers apt to drive the resolution of the litigation." *Dukes*, 564 U.S. at 350-51. For example, whether Humana is "liable" for a call does not generate common answers. Instead, the prerequisites to "liability," such as consent, must be analyzed individually, as discussed at length above. That is especially true because Humana often calls non-members like family, friends, and care facilities that consent to receive calls for members. And the only issue identified by Plaintiff that is *potentially* resolvable in one fell swoop—whether a particular call was to a cell phone—would not resolve liability.

### 2.    Plaintiff Cannot Establish Adequacy.

Plaintiff and his counsel are both inadequate as well, independently precluding certification.

First, Plaintiff is inadequate because he perjured himself in his deposition about the number of voicemails he received. *See* ECF No. 142 at 14-16. "Courts may consider the proposed representative's honesty and trustworthiness when assessing adequacy" and deny certification when a representative's credibility is "'dubious with respect to substantial issues directly relevant to the claims at issue'" *Shupe v. Rocket Companies*, 2024 WL 4349172, at *35 (E.D. Mich. Sept. 30, 2024) (deposition "highlight[ed] [plaintiff's] inability to remember important details central to this litigation" and "at worst" showed his dishonesty) (citing *Gooch v. Life Investors*, 672 F.3d 402, 431 (6th Cir. 2012)); *accord Davis v. Magna Int'l*, 2023 WL 3729443, at *4 (E.D. Mich. Mar. 27, 2023) (denying class certification in part because "discrepancy" in representative's deposition testimony either "[went] to veracity" or "raise[d] questions about his ability to attend to details or information related to this case"); *Clough v. Revenue Frontier*, 2019 WL 2527300, at *5 (D.N.H.

June 19, 2019) (collecting cases)); *Harden v. Autodesk*, 2016 WL 4408905, at *4 (W.D. Mich. Aug. 19, 2016) (denying certification because representative's testimony was "directly at odds with documents in the record," rendering him inadequate).

Plaintiff's false statements about the number of voicemails he received make him inadequate. His perjury is "directly relevant to the claims at issue," and "directly at odds with documents in the record." *Shupe*, 2024 WL 4349172, at *35. His own later-subpoenaed phone records revealed (two months after his deposition, when he thought he could get away with his false testimony) that he had received *at most three* voicemails, not 22. *See* ECF No. 142 at 14-16 (citing ECF No. 113-2.A at Tracfone 14). That perjury "significantly undermine[d] his credibility, jeopardize[d] his claim, and impair[ed] the interests of the proposed class." *Harden*, 2016 WL 4408905, at *4.

Plaintiff's counsel are likewise inadequate because they aided, abetted, and filed briefs relying on their client's perjury. *See, e.g.*, ECF No. 114-1 at 9-10 (citing and repeating Plaintiff's proven-false testimony about the number of calls he received). "[M]isconduct that prejudices the class," such as facilitating testimony that eviscerates the credibility of the class representative on a substantial issue directly relevant to the claims at issue, "requires denial of class certification." *Compressor Eng'g v. Mfrs. Fin.*, 292 F.R.D. 433, 445 (E.D. Mich. 2013), *vac. on recon.*, 2016 WL 1394649 (vacating on other grounds).

Plaintiff's counsel are inadequate for a significant ethical violation as well: Failing to communicate settlement offers. Plaintiff testified that he didn't learn of Humana's offer to settle his claims (for substantially more than they were worth) until Humana's counsel brought it up *in his deposition*. *See* ECF No. 113-3 at 117:16-118:23. During his testimony, Plaintiff repeatedly expressed confusion after Humana's counsel asked if he was "aware of any of the offers that Humana has made to try to resolve this case?" *Id.* **Plaintiff's counsel** then clarified the question: "The question is: Are you aware of Humana making an offer to resolve the matter with you?" *Id.* Plaintiff answered: "Okay. **I have no knowledge of any settlement offered to me**, then." *Id.* (emphasis added). That alone renders counsel inadequate. *See Kulig v. Midland Funding, LLC*,

2014 WL 5017817, at * 4-6 (S.D.N.Y. Sept. 26, 2014) (denying certification because counsel failed to inform client of settlement offer); *see also* Ohio R. of Prof. Conduct 1.4(a) cmt.2 (requiring lawyers to "promptly inform the client" about settlement offers); Utah Code of Jud. Admin. R. 13-1.04 cmt.2 (same).

### 3. Plaintiff Cannot Establish Typicality.

Plaintiff also cannot meet his burden to prove his claims are typical of the putative class. He's *not even a member of the putative class*, since no "wrong number" note exists for Plaintiff's phone number in CGX, as explained above, alone dooming typicality. *See* Fed. R. Civ P. 23(a)(3); *see also Rutherford v. City of Cleveland*, 137 F.3d 905, 909 (6th Cir. 1998) ("A class representative must be part of the class'") (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997)).

Courts have denied certification in cases involving the same Plaintiff's expert on this ground. *See e.g.*, *Sandoe*, 333 F.R.D. at 8 (denying certification in TCPA class action including because Plaintiff's expert here "failed to identify the named plaintiff in a putative class action under the TCPA."); *Wilson*, 329 F.R.D. at 457 (same).

And he's atypical because his individual claims are subject to unique defenses. Whether the emergency-purposes exception applies and precludes his claim, for example, is a defense for which *Plaintiff himself contends* there's a dispute of fact. *See Nghiem v. Dick's Sporting Goods, Inc.*, 318 F.R.D. 375, 383, n. 4 (C.D. Cal. 2016) (finding plaintiff atypical because his "unique" claims were a major focus, even if defenses to them may not "ultimately prevail").[7]

### 4. Plaintiff Cannot Establish Numerosity.

Plaintiff also fails to satisfy Rule 23(a)(1), which requires him to prove that his proposed classes are "so numerous that joinder of all members is impracticable." For the same reasons that Plaintiff fails to satisfy ascertainability (as discussed above), Plaintiff fails to show that the class is numerous. That is, Plaintiff has not identified a ***single*** person—himself included—who falls

---

[7] Humana maintains that the emergency-purposes exception applies to all its HRA calls to SNP members as a matter of law. *See* ECF Nos. 113 at 16-20 (MSJ) & 142 at 11-13 (MSJ Reply). But if the Court finds otherwise, then litigating the facts of whether the emergency-purposes exception applies to Plaintiff's claims is a unique defense that will distract from issues common to the rest of the class.

within the class definition. He has failed to show any reliable evidence identifying even one recipient of an HRA call from Humana that played a PRV at a phone number "not assigned to a current account holder of Humana."

Courts have denied class certification for failure to prove numerosity with far *more* than what Plaintiff offers here. *Sliwa*, 333 F.R.D. at 273 (list of phone numbers directly coded "wrong number"—not gleaned from one database imperfectly corresponding with unreliable freestyle "wrong number" notes in another—"failed to establish that any of the cell phone numbers on that list *actually* belong to non-customers"). Plaintiff has likewise failed to establish numerosity here.

### 5.    Plaintiff Cannot Establish Superiority.

Last, class certification should be denied because "a class action" is not superior to adjudicate this dispute. Fed. R. Civ P. 23(b)(3). Myriad individual issues exist, as detailed above. And Humana would be entitled, as a matter of due process, to call tens of thousands of witnesses at trial to resolve them. *See* Gensler & Mulligan, 1 Federal Rules of Civil Procedure, Rules and Commentary, Rule 23; *Shamblin.*, 2015 WL 1909765, at *7 (recognizing "constitutional right to a jury determination as to whether any person consented to receiving calls to their cellular telephone") (cit. omitted). No such class action could *ever* be tried.

Nor is a class action superior when "meritorious individual claims might be resolved in small claims court," as could be done here. *Jeffrey Katz Chiropractic v. Diamond Respiratory Care*, 340 F.R.D. 383, 389 (N.D. Cal. 2021). In fact, the TCPA's statutory damages of $500 to $1,500 for a single call were "designed to provide adequate incentive for an individual plaintiff to bring suit on his own behalf." *Forman v. Data Transfer*, 164 F.R.D. 400, 404 (E.D. Pa. 1995); *Vigus v. Southern Illinois Riverboat/Casino Cruises*, 274 38 F.R.D. 229, 238 (S.D. Ill. 2011) (noting class members have a "quick, adequate and superior remedy in other more speedy venues such as, for example, a small claims court.").

## V.    <u>CONCLUSION</u>

In sum, Plaintiff's motion to certify a class should be denied.

DATED:  December 17, 2024

*/s/ Alexander D. Terepka*

Ryan D. Watstein (pro hac vice)
Alexander D. Terepka (pro hac vice)
Logan R. Leonard (pro hac vice)
**WATSTEIN TEREPKA, LLP**
1055 Howell Mill Road, 8th Floor
Atlanta, Georgia 30318
Tel. (404) 400-3382
Email: alex@wtlaw.com
Email: ryan@wtlaw.com
Email: lleonard@wtlaw.com

*/s/ H. Toby Schisler*

H. Toby Schisler (pro hac vice)
K. Cassandra Carter, Esq. (KBA #98018)
Dinsmore & Shohl LLP
255 East Fifth Street, Suite 1900
Cincinnati, Ohio 45202
Telephone: (513) 977-8152
Fax: (513) 977-8141
Email: toby.schisler@dinsmore.com
Email:  cassandra.carter@dinsmore.com

*Counsel for Humana Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and accurate copy of the foregoing was served upon all counsel of record through the Court's ECF/PACER e-filing system on this 10th day of December 2024.

/s/ <i>H. Toby Schisler</i><br>H. Toby Schisler